STATE OF CONNECTICUT *v.* JOHN DUPIGNEY
(SC 18363)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued December 9, 2009—officially released March 9, 2010

*W. Theodore Koch III*, special public defender, with whom, on the brief, was *William T. Koch, Jr.*, special public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom were *Margaret Gaffney Radionovas*, senior assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, and *Linda N. Howe*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. This appeal raises an issue of first impression before this court, namely, the meaning and proper application of the standard for obtaining postconviction DNA testing of evidence under General Statutes § 54-102kk (b) (1),[1] pursuant to which a petitioner is entitled

[1] General Statutes § 54-102kk provides: "(a) Notwithstanding any other provision of law governing postconviction relief, any person who was convicted of a crime and sentenced to incarceration may, at any time during the term of such incarceration, file a petition with the sentencing court requesting the DNA testing of any evidence that is in the possession or control of the Division of Criminal Justice, any law enforcement agency, any laboratory or the Superior Court. The petitioner shall state under penalties of perjury that the requested testing is related to the investigation or prosecution that resulted in the petitioner's conviction and that the evidence sought to be tested contains biological evidence.

"(b) After notice to the prosecutorial official and a hearing, the court shall order DNA testing if it finds that:

"(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(c) After notice to the prosecutorial official and a hearing, the court may order DNA testing if it finds that:

"(1) A reasonable probability exists that the requested testing will produce DNA results which would have altered the verdict or reduced the petitioner's sentence if the results had been available at the prior proceedings leading to the judgment of conviction;

"(2) The evidence is still in existence and is capable of being subjected to DNA testing;

to such relief if he demonstrates that a "reasonable probability exists that [he] would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing . . . ." Following his 2000 conviction for murder and related firearms offenses and an unsuccessful appeal from the judgment of conviction; see *State* v. *Dupigney*, 78 Conn. App. 111, 826 A.2d 241, cert. denied, 266 Conn. 919, 837 A.2d 801 (2003); the defendant, John Dupigney (petitioner), filed a petition, pursuant to § 54-102kk (b), requesting DNA testing of a hat found at the murder scene that was introduced into evidence by the state in the petitioner's criminal trial. The petitioner now appeals from the decision of the trial court, *Damiani, J.*, denying his petition.[2] The petitioner claims that the trial court improperly concluded that there was no reasonable probability that exculpatory DNA evidence would have altered the outcome of his trial. We conclude that the trial court properly applied the reasonable probability

"(3) The evidence, or a specific portion of the evidence identified by the petitioner, was never previously subjected to DNA testing, or the testing requested by the petitioner may resolve an issue that was never previously resolved by previous testing; and

"(4) The petition before the Superior Court was filed in order to demonstrate the petitioner's innocence and not to delay the administration of justice.

"(d) The costs of DNA testing ordered pursuant to this section shall be borne by the state or the petitioner, as the court may order in the interests of justice, except that DNA testing shall not be denied because of the inability of the petitioner to pay the costs of such testing.

"(e) In a proceeding under this section, the petitioner shall have the right to be represented by counsel and, if the petitioner is indigent, the court shall appoint counsel for the petitioner in accordance with section 51-296."

[2] The petitioner appealed from the trial court's decision to the Appellate Court. We thereafter granted the state's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. We heard oral argument on this case the same day that we heard argument on *State* v. *Marra*, 295 Conn. 74, 988 A.2d 865 (2010), which raises the same legal issue as in this case, and which decision we also released today.

standard under § 54-102kk, and we therefore affirm the trial court's decision.

The record, including the Appellate Court's opinion in the petitioner's appeal from his underlying judgment of conviction, reveals the following facts that the jury reasonably could have found, as well as the pertinent procedural history. "Morris Lewis, the victim, and Herbert Dupigney, the [petitioner's] brother, were partners in an illegal drug selling enterprise in New Haven. The drug sales were conducted primarily at 304 Winthrop Avenue. Other members of the operation included Nick Padmore, an[d] individuals known to the participants in the trial only as 'Ebony' and Eric Raven. In December, 1994, following the victim's incarceration, the [petitioner] moved from Boston to New Haven to assist his brother in the drug operation. The [petitioner] also enlisted an acquaintance from Boston, Derrick D'Abreau, to help with the drug sales. D'Abreau moved to New Haven in the beginning of January, 1995.

"The victim was released from jail on January 23, 1995. That day, the victim telephoned Herbert Dupigney at the home of Carlotta Grinman. Grinman overheard the [petitioner subsequently] tell his brother . . . that the victim 'was not going [to] get a . . . thing.'

"On January 24, 1995, at about 9:30 p.m., the victim met with the [petitioner] . . . Herbert Dupigney, D'Abreau, Padmore, Raven and 'Ebony' at 304 Winthrop Avenue. Upon his arrival at the building, the victim told everybody to leave because that was his location to sell drugs. As the argument escalated, the victim slapped the [petitioner] and threw a chair at him. The victim then broke a bottle and attempted to attack the [petitioner]. D'Abreau and Raven retreated to a turquoise Dodge Neon. The victim then started swiping the bottle at the occupants of the vehicle through one of its open windows. While Herbert Dupigney attempted to calm

the victim and get him away from the car, the [petitioner] inquired if anybody had a gun. In response, D'Abreau gave the [petitioner] a .380 caliber pistol. The [petitioner] then pointed the gun at the victim and told him to back off.

"Herbert Dupigney and the [petitioner] then entered the turquoise Dodge Neon and left the scene. The group proceeded to [Raven's] apartment at 202 Sherman Avenue. The [petitioner] was visibly upset, and stated that the victim was getting on his nerves and that he was going to kill [the victim]. After a few minutes, the [petitioner] and his brother left.

"The [petitioner] and his brother rejoined [Raven] and D'Abreau at 202 Sherman Avenue approximately one hour later. Between 11:15 p.m. and 11:30 p.m., all four individuals proceeded to 300 Winthrop Avenue, where the drug operation had rented a fourth floor room facing Winthrop Avenue. At that time, the victim was playing dice with Padmore and 'Ebony' in front of 304 Winthrop Avenue. Herbert Dupigney went down to the street to try to smooth things over with the victim. It was understood that if the attempt at reconciliation was unsuccessful, then the victim would be shot. The [petitioner], [Raven] and D'Abreau observed the scene from the apartment's window. After a few minutes of conversation between the parties and with no overt indication that an accord had been reached, the victim, Padmore and 'Ebony' walked off in the direction of Edgewood Avenue. Herbert Dupigney called out to 'Ebony.' After 'Ebony' started to return, the [petitioner] and [Raven] abruptly left the apartment.

"As the victim and Padmore approached the corner of Winthrop Avenue and Edgewood Avenue, the turquoise Dodge Neon approached them. The [petitioner] exited the vehicle and fired several shots at the victim. A brief struggle ensued, after which the [petitioner] fired more

shots at the victim. The victim died of his wounds shortly thereafter." Id., 112–14.

Shortly after the shooting, Padmore "contacted the New Haven police . . . claiming to have information regarding the crime. The police interviewed him on February 1, 1995. At that time, [Padmore] provided the police with a [tape-recorded] statement identifying the [petitioner] as the assailant. He also identified the [petitioner] as the shooter from a photographic array and signed the [petitioner's] photograph. Both the [tape-recorded] statement and the photograph were admitted into evidence under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)."[3] *State* v. *Dupigney*, supra, 78 Conn. App. 120–21.

As a result, the state thereafter charged the petitioner with one count of murder in violation of General Statutes § 53a-54a, one count of carrying a pistol without a permit in violation of General Statutes § 29-35 and one count of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c. Id., 114. At trial, the state offered into evidence a black knit hat, bloodied and with two holes, that the police had recovered from the driveway of 315 Winthrop Avenue on the night of the murder. Two witnesses for the state, D'Abreau and Aisha Wilson, testified that they had observed the shooting from the fourth floor of an apartment building across the street from 315 Winthrop Avenue. Both witnesses identified the petitioner as the shooter and testified that the petitioner had been wear-

[3] "At trial, Padmore claimed to have been under the influence of illegal drugs while at the New Haven police station and denied any memory of either providing the statement to the police or choosing the [petitioner's] photograph from the array. The police detective who interviewed Padmore at the station testified that he appeared clearheaded and sober while at the station." *State* v. *Dupigney*, supra, 78 Conn. App. 121 n.3.

ing a black knit hat both just before the shooting and at the time of the shooting.[4]

The petitioner essentially presented a mistaken identity defense. During the criminal trial, the petitioner's counsel made a motion to have the hat tested. The trial court, *Owens, J.*, denied the motion. Thereafter, the petitioner was found guilty on all three counts[5] and was sentenced to a total effective term of seventy years incarceration. Id., 114–15.

After an unsuccessful direct appeal to the Appellate Court, in which the petitioner did not challenge the trial court's denial of his motion for DNA testing, the petitioner filed a habeas corpus petition, claiming, inter alia, that his trial counsel had been ineffective for failing to move timely for DNA testing of the hat found at the murder scene. In furtherance of that petition, which is still pending, the petitioner also filed the petition at issue in the present case seeking DNA testing of the hat under § 54-102kk. In 2007, the trial court, *Damiani, J.*, conducted a hearing on the § 54-102kk petition, after which the court denied the petition on the ground that the petitioner had not shown that there was a reasonable probability that he would not have been prosecuted or convicted if the hat had been tested.

On appeal to this court, the petitioner claims that the trial court improperly denied his motion for postconviction DNA testing under § 54-102kk (b). Specifically, he claims that the trial court misapplied the statute, under

---

[4] The witnesses described the hat in slightly different terms, but all of these descriptions were consistent with the black knit cap recovered from the crime scene, and neither the state nor the petitioner contends that these minor inconsistencies are relevant.

[5] The petitioner had elected a jury trial on the charges of murder and carrying a pistol without a permit, and a trial to the court on the remaining charge of criminal possession of a pistol or revolver. See *State* v. *Dupigney*, supra, 78 Conn. App. 114. All of the counts were tried concurrently. Id.

which he is entitled to DNA testing if a "reasonable probability exists that [he] would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing . . . ."[6] General Statutes § 54-102kk (b) (1). To support this claim, the petitioner suggests that testing on the hat could reveal DNA matching neither the victim nor the petitioner and that such a finding could create a reasonable probability that the jury could have formed a reasonable doubt that the petitioner was the shooter. We disagree.

I

Neither this court nor the Appellate Court has construed the standard for ordering postconviction DNA testing under § 54-102kk (b). Therefore, before we can determine whether the trial court properly applied the reasonable probability standard under that statute, we must ascertain its meaning. Because this is an issue of statutory interpretation, we exercise de novo review. See *State* v. *Fernando A.*, 294 Conn. 1, 13, 981 A.2d 427 (2009).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) Id., 13–14. In construing § 54-102kk (b), we are mindful of the legislature's directive that, "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the lan-

---

[6] In addition, the petitioner claims that, to the extent that the trial court's decision also may be interpreted as denying the petition on the ground that the hat was not capable of being tested, such a conclusion was improper. In light of our conclusion that the trial court properly determined that the petitioner did not meet the reasonable probability standard, we need not address this claim.

guage; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."[7] General Statutes § 1-1 (a). Moreover, words having a determined meaning at common law generally are given that same meaning in a statute. See *Southington* v. *Southington Water Co.*, 80 Conn. 646, 658, 69 A. 1023 (1908). Drawing on this long-standing principle, this court has stated that "legal terms . . . absent any legislative intent shown to the contrary, are to be presumed to be used in their legal sense. . . . Words with a fixed legal or judicially settled meaning must be presumed to have been used in that sense. . . . In ascertaining legislative intent [r]ather than using terms in their everyday sense, [t]he law uses familiar legal expressions in their familiar legal sense. . . . *Peck* v. *Jacquemin*, 196 Conn. 53, 70–71, 491 A.2d 1043 (1985); see also *Southington* v. *State Board of Labor Relations*, 210 Conn. 549, 561, 556 A.2d 166 (1989) (terms not defined in statutes should be given common or legal understanding); *Doe* v. *Manson*, 183 Conn. 183, 186, 438 A.2d 859 (1981); *Faulkner* v. *Solazzi*, 79 Conn. 541, 546, 65 A. 947 (1907)." (Internal quotation marks omitted.) *Perkins* v. *Freedom of Information Commission*, 228 Conn. 158, 169–70, 635 A.2d 783 (1993); see also *State* v. *Jones*, 289 Conn. 742, 755, 961 A.2d 322 (2008) ("the meaning of extreme indifference to human life . . . can be

---

[7] We also are mindful of General Statutes § 1-2z, which directs us to consider "the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." In the present case, neither the petitioner nor the respondent, the state of Connecticut, contends that the phrase "reasonable probability" has a plain meaning in this context. Rather, both parties appear to presume that it is a legal term of art whose meaning has been established under postconviction jurisprudence. Moreover, as our discussion of this case law reflects, the continued refinements of this standard evidences its lack of a plain meaning.

achieved by reference to any dictionary and to judicial opinions addressing violations of [the manslaughter statute]" [internal quotation marks omitted]).

Although, at the time the legislature adopted § 54-102kk in 2003; see Public Acts 2003, No. 03-242, § 7; there was no jurisprudence concerning the meaning of reasonable probability within the novel context of postconviction DNA testing,[8] this term did have a well established meaning in the context of postconviction challenges, generally. Accordingly, we examine those decisions concerning the meaning of reasonable probability within this broader context to ascertain the meaning of that term as used in § 54-102kk.

The developments within two interrelated lines of cases are particularly relevant: the *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), line of cases governing postconviction challenges on the basis of prosecutorial failure to disclose evidence to an accused; and the *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), line of cases governing postconviction claims of ineffective assistance of counsel. In *Brady*, the United States Supreme Court held that the prosecution's failure to disclose evidence favorable to an accused violates due process when the evidence is material either to guilt or to punishment, but that court did not define materiality. *Brady* v. *Maryland*, supra, 87. When later considering the meaning of materiality for *Brady* violations in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), the court looked to the *Strickland* framework for evaluating prejudice in post-conviction claims of ineffective assistance of counsel, under which "[t]he defendant must show that there is

---

[8] As we explain later in this part of the opinion, the national trend toward providing DNA testing as a postconviction remedy is a relatively recent development.

a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *A reasonable probability is a probability sufficient to undermine confidence in the outcome.*"[9] (Emphasis added.) *Strickland* v. *Washington,* supra, 694. Applying the *Strickland* reasonable probability standard to *Brady* claims, the Supreme Court held that undisclosed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682. The court subsequently clarified this standard by explaining: "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). . . . [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (Citations omitted; internal quotation marks omitted.) *Kyles* v. *Whitley,* 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

This court adopted the *Strickland* reasonable probability standard for ineffective assistance of counsel

---

[9] In formulating this standard, the court in *Strickland* v. *Washington,* supra, 466 U.S. 697, had emphasized: "[T]he ultimate focus of inquiry must be on the *fundamental fairness* of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is *unreliable* because of a breakdown in the adversarial process that our system counts on to produce just results." (Emphasis added.)

claims in *Levine* v. *Manson*, 195 Conn. 636, 640, 490 A.2d 82 (1985), and later applied it to *Brady* violations in *State* v. *Pollitt*, 205 Conn. 132, 142–43, 531 A.2d 125 (1987). Since then, this court regularly and consistently has defined reasonable probability as a probability sufficient to undermine confidence in the outcome in determining materiality in *Brady* claims and weighing prejudice in *Strickland* claims. See, e.g., *State* v. *Breton*, 264 Conn. 327, 335 n.20, 824 A.2d 778 (*Brady* claim), cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *State* v. *Wilcox*, 254 Conn. 441, 454, 758 A.2d 824 (2000) (*Brady* claim); *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 155, 662 A.2d 718 (1995) (*Strickland* claim); *Fair* v. *Warden*, 211 Conn. 398, 408, 559 A.2d 1094 (*Strickland* claim), cert. denied, 493 U.S. 981, 110 S. Ct. 512, 107 L. Ed. 2d 514 (1989); *State* v. *Milner*, 206 Conn. 512, 539 n.13, 539 A.2d 80 (1988) (*Brady* claim). This court also adopted and has applied the United States Supreme Court's subsequent clarification of the reasonable probability standard that focuses on the fairness and reliability of the verdict.[10] See *State* v. *Ortiz*, 280 Conn. 686, 720–21, 911 A.2d 1055 (2006); *State* v. *Wilcox*, supra, 454; *State* v. *Esposito*, 235 Conn. 802, 814–15, 670 A.2d 301 (1996).

In elaborating on the practical application of this standard in the *Brady* context, this court explained that a showing of reasonable probability "does not require demonstration by a preponderance that disclosure of the [unavailable] evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence,

---

[10] This court similarly has emphasized that analysis of prejudice under *Strickland* must take into account the overall fairness and reliability of the conviction. See *Fair* v. *Warden*, supra, 211 Conn. 408 (prejudice standard of *Strickland* "requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable" [internal quotation marks omitted]).

but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.[11] . . . The United States Supreme Court also emphasized that the [relevant test under *United States v. Bagley,* supra, 473 U.S. 682] is not a sufficiency of the evidence test. . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the [unavailable] evidence, there would not have been enough left to convict. . . . Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether [the unavailability] of the evidence was so unfair as to undermine our confidence in the jury's verdict." (Internal quotation marks omitted.) *State* v. *Ortiz,* supra, 280 Conn. 717–18; see also *State* v. *Wilcox,* supra, 254 Conn. 454; *State* v. *Ross,* 251 Conn. 579, 595, 742 A.2d 312 (1999).

Nearly twenty years passed between this court's adoption of the *Strickland* reasonable probability standard for claims of ineffective assistance of counsel and *Brady* violations and the legislature's adoption of § 54-102kk. We are mindful that, unlike *Brady* and *Strickland,* which are premised on federal constitutional rights, there is no federal constitutional right to postconviction DNA testing. *District Attorney's Office* v. *Osborne,* 557 U.S. 52, 61–62, 75, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009). Moreover, success on a § 54-102kk petition does not afford the ultimate form of relief of

---

[11] Contrast this court's language in *State* v. *Ortiz,* supra, 280 Conn. 717, with *Shabazz* v. *State,* 259 Conn. 811, 820–21, 792 A.2d 797 (2002) ("a court is justified in granting a petition for a *new trial* when it is satisfied that the evidence offered in support thereof: [1] is newly discovered such that it could not have been discovered previously despite the exercise of due diligence; [2] would be material to the issues on a new trial; [3] is not cumulative; and [4] *is likely to produce a different result in the event of a new trial*" [emphasis added]).

a new trial mandated for *Brady*[12] and *Strickland* violations. We are nonetheless persuaded that, because the reasonable probability standard had acquired a well settled meaning in the context of postconviction remedies, the legislature was mindful of that legal meaning when it adopted § 54-102kk. Accordingly, we conclude that a "reasonable probability" under § 54-102kk (b) (1) means a probability sufficient to undermine confidence in the outcome. Cf. *Richardson* v. *Superior Court*, 43 Cal. 4th 1040, 1050–51, 183 P.3d 1199, 77 Cal. Rptr. 3d 226 (2008) (reaching same conclusion when construing comparable California statute).[13]

This construction of the reasonable probability standard is supported by dual policy interests relevant to postconviction DNA testing evident in the legislative history of § 54-102kk. Section 54-102kk was enacted as part of broad legislation that, inter alia, expanded the state's DNA bank and established a wrongful conviction review panel. See Public Acts 2003, No. 03-242. The legislative history reveals that the legislation was intended to use DNA testing both to better identify and punish offenders as well as to prevent wrongful

---

[12] Although the term *"Brady* material" is often used to refer to any exculpatory evidence that should have been disclosed to a defendant, a *Brady* "violation" that affords the relief of a new trial requires that the defendant show: (1) the government suppressed evidence; (2) the suppressed evidence was favorable to the defendant; and (3) the suppressed evidence was *material* either to guilt or to punishment. See *State* v. *Skakel*, 276 Conn. 633, 700, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

[13] In *Richardson* v. *Superior Court*, supra, 43 Cal. 4th 1050, the California Supreme Court held that "reasonable probability" in that state's postconviction DNA statute has the same meaning that it has in connection with claims of ineffective assistance of counsel under *Strickland* and under state law precedent controlling the assessment of prejudice. Specifically, the court noted that, under *Strickland*, a reasonable probability is "a probability sufficient to undermine confidence in the outcome" and adopted this definition for postconviction DNA testing claims. (Internal quotation marks omitted.) Id. The court went on to clarify that a reasonable probability is "a reasonable chance and not merely an abstract possibility." Id., 1051.

convictions. See, e.g., 46 H.R. Proc., Pt. 20, 2003 Sess., pp. 6650–52, remarks of Representative Jeffrey J. Berger (discussing use of DNA to identify offenders and to exonerate innocent); id., pp. 6659–60, remarks of Representative Patricia Dillon (noting that "[w]hat actually has turned out in the past five or six years is that we have discovered that a number of individuals have been able to use DNA evidence postconviction to establish their innocence"); id., p. 6675, remarks of Representative Christopher R. Stone ("[w]e are also providing in this bill not only an avenue by which we can monitor those convicted but also an avenue by which those who might be wrongfully convicted can get those convictions overturned").

This legislative history mirrors a nationwide movement toward using DNA technology to increase accuracy in criminal convictions that has been spurred by the revelation of DNA of the "reality of wrongful convictions—a reality which challenges us to reaffirm our commitment to the principle that the innocent should be freed." *McKithen* v. *Brown*, 481 F.3d 89, 92 (2d Cir. 2007), cert. denied, 552 U.S. 1179, 128 S. Ct. 1218, 170 L. Ed. 2d 59 (2008). Much of the progress in this area has been accomplished through legislation: forty-six states and the District of Columbia,[14] and the federal

---

[14] Ala. Code § 15-18-200 (Cum. Sup. 2009); Ariz. Rev. Stat. Ann. § 13-4240 (2001); Ark. Code Ann. § 16-112-202 (2006); Cal. Penal Code § 1405 (Deering 2008); Del. Code Ann. tit. II, § 4504 (2007); D.C. Code Ann. § 22-4133 (LexisNexis Sup. 2009); Fla. Stat. § 925.11 (2007); Ga. Code Ann. § 5-5-41 (Sup. 2009); Haw. Rev. Stat. § 884D-123 (Cum. Sup. 2008); Idaho Code Ann. §§ 19-2719 and 19-4902 (2004); 725 Ill. Comp. Stat. Ann. § 5/116-3 (West 2008); Ind. Code Ann. §§ 35-38-7-1 through 35-38-7-19 (LexisNexis Cum. Sup. 2008); Iowa Code Ann. § 81.10 (West 2009); Kan. Stat. Ann. § 21-2512 (2007); Ky. Rev. Stat. Ann. §§ 422.285 and 422.287 (LexisNexis 2005); La. Code Crim. Proc. Ann. art. 926.1 (Cum. Sup. 2010); Me. Rev. Stat. Ann. tit. 15, §§ 2137 and 2138 (Cum. Sup. 2009); Md. Code Ann., Crim. Proc. § 8-201 (LexisNexis Sup. 2009); Mich. Comp. Laws Serv. § 770.16 (LexisNexis Cum. Sup. 2009); Minn. Stat. § 590.01 (2008); Miss. Code Ann. § 99-39-5 (Cum. Sup. 2009); Mo. Rev. Stat. § 547.035 (Cum. Sup. 2006); Mont. Code. Ann. § 46-21-110 (2007); Neb. Rev. Stat. §§ 29-4117 through 29-4125 (Sup. 2008); Nev. Rev. Stat. § 176.0918 (2007); N.H. Rev. Stat. Ann. § 651-D:2 (2007); N.J. Stat. Ann.

government[15] have enacted statutes providing for post-conviction DNA testing. See generally *District Attorney's Office* v. *Osborne,* supra, 557 U.S. 62 (noting that state legislatures have engaged in "serious, thoughtful examinations . . . of how to ensure the fair and effective use of this testing within the existing criminal justice framework" [citation omitted; internal quotation marks omitted]); B. Garrett, "Claiming Innocence," 92 Minn. L. Rev. 1629, 1673–75 (2008) (discussing evolution of state postconviction DNA testing statutes).

As the United States Supreme Court recently noted, however, postconviction DNA provisions must "recognize the value of DNA evidence but also the need for certain conditions on access to the [s]tate's evidence." *District Attorney's Office* v. *Osborne,* supra, 557 U.S. 63. Conditioning access to DNA evidence serves important state interests, including respect for the finality of court judgments and the efficient use of limited state resources. See id., 79–85 (Alito, J., concurring). Legislatures thus have faced the dilemma of "how to harness DNA's power to prove innocence without unnecessarily

---

§ 2A:84A-32a (West Cum. Sup. 2009); N.M. Stat. § 31-1A-2 (Cum. Sup. 2008); N.Y. Crim. Proc. Law § 440.30 (McKinney 2005); N.C. Gen. Stat. § 15A-269 (2007); N.D. Cent. Code § 29-32.1-15 (2006); Ohio Rev. Code Ann. §§ 2953.71 and 2953.72 (West 2006); Okla. Stat. Ann. tit. 22, § 1371.1 (West Cum. Sup. 2010); Or. Rev. Stat. §§ 138.690 and 138.692 (2007); 42 Pa. Cons. Stat. Ann. § 9543.1 (West 2007); R.I. Gen. Laws § 10-9.1-12 (Sup. 2008); S.C. Code Ann. §§ 17-28-20 through 17-28-90 (Cum. Sup. 2009); S.D. Codified Laws § 1166 (2009); Tenn. Code Ann. §§ 40-30-303 through 40-30-305 (2006); Tex. Crim. Proc. Code Ann. § 64.03 (Vernon Cum. Sup. 2009); Utah Code Ann. § 78-35a-301 (2002); Vt. Stat. Ann. tit. 13, §§ 5561 and 5566 (Cum. Sup. 2009); Va. Code Ann. § 19.2-327.1 (2008); Wash. Rev. Code Ann. § 10.73.170 (West Cum. Sup. 2010); W. Va. Code Ann. § 15-2B-14 (LexisNexis 2009); Wis. Stat. Ann. § 974.07 (West Cum. Sup. 2009); Wyo. Stat. Ann. § 7-12-303 (2009). The three states without explicit statutory provisions for postconviction DNA testing provide some access to testing through general provisions for discovery and postconviction relief. See *District Attorney's Office* v. *Osborne,* supra, 557 U.S. 64 (discussing postconviction DNA testing in Alabama, Alaska and Massachusetts).

[15] 18 U.S.C. § 3600.

overthrowing the established system of criminal justice." Id., 62. To reconcile these competing interests, legislatures have imposed various threshold showings, including materiality requirements such as the "reasonable probability" standard at issue in this case. See id., 63. Applying the *Brady/Strickland* meaning of reasonable probability to § 54-102kk (b) (1) serves these conflicting interests by requiring access to DNA testing only in those situations in which, if exculpatory results were discovered by DNA testing, these results would undermine confidence in the outcome of the trial.[16] See *State* v. *Ortiz*, supra, 280 Conn. 717–18.

## II

Having determined that a reasonable probability under § 54-102kk (b) (1) is a probability sufficient to undermine confidence in the outcome, we turn to the petitioner's claim that the trial court improperly concluded that no reasonable probability existed that the petitioner would have been acquitted had DNA testing of the black hat recovered from the crime scene yielded exculpatory results.[17] Specifically, the petitioner con-

[16] Under § 54-102kk (b) (1), a petitioner may succeed by demonstrating a reasonable probability that he would not have been convicted *or prosecuted* if exculpatory DNA evidence had been available. In the present case, because the petitioner claims only that there is a reasonable probability that he would have been *acquitted* had the evidence been available, we limit our analysis to whether such evidence would undermine our confidence in the outcome of the trial.

[17] In orally denying the petitioner's motion, the court stated: "Looking at the statute, [§] 54-102kk, looking at the transcripts, the shooter had a black knit cap on. The shooting took place, the shooter left, [the victim] stumbled around and he ends up in the driveway or alley of 315 Winthrop [Avenue] and that's where he expired. A black knit cap is there. I mean, for me to assume that that is the same black knit cap that [the petitioner] had on is pure speculation. We have two people, [Wilson and D'Abreau], who identified your client as the shooter. That cap—and [D'Abreau] at the hearing for probable cause said he found your client's knit hat on Hotchkiss Street, almost a block away. So you have not made your requisite showing that a reasonable probability exists that [the petitioner] would not have been prosecuted or convicted if that hat were tested. . . .

tends that, if testing on the hat were to reveal DNA matching neither him nor the victim, there would be a "reasonable probability that a reasonable doubt could form as to whether [the petitioner] was really the shooter . . . ." He posits that acquittal due to a reasonable doubt would be particularly likely if the DNA were traced to a different known individual.

Before we address the petitioner's claim, we must address the appropriate standard of review for the denial of a petition under § 54-102kk (b), which also is an issue of first impression. In light of our conclusion in part I of this opinion that, in drafting § 54-102kk, the legislature intended to adopt the meaning of reasonable probability set forth in this court's *Brady* and *Strickland* precedents, we conclude that the standard of review for *Brady* and *Strickland* claims applies to challenges to the trial court's reasonable probability determination under § 54-102kk (b) (1). Accordingly, the determination of whether a "reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing" pursuant to § 54-102kk (b) (1) is a question of law subject to plenary review, while any underlying historical facts found by the trial court are subject to review for clear error.[18] See *Craw-*

---

"I mean, you are assuming that, and I don't see anything in the record that the shooter chased [the victim] into that alley, shot him, and—or shot and chased him and then took off his knit hat and dropped it on the ground. . . . [Y]ou are trying to do your job for your client but your whole premise is built on mere speculation built on quicksand. It doesn't hold, sir. So the request for DNA testing is denied . . . ."

[18] We note that in *State* v. *Ortiz*, supra, 280 Conn. 721–22, we reasoned that, "[b]ecause the trial judge had the opportunity . . . to observe firsthand the proceedings at trial . . . our independent review . . . is informed by his assessment of the impact of the *Brady* violation, and we find persuasive the Second Circuit Court of Appeal's approach of engaging in independent review, yet giving 'great weight' to the 'trial judge's conclusion as to the effect of nondisclosure on the outcome of the trial . . . .' " We are mindful that petitions under § 54-102kk must be submitted to the trial judge who presided over sentencing; *Mitchell* v. *Commissioner of Correction*, 93 Conn. App. 719, 722–23, 891 A.2d 25, cert. denied, 278 Conn. 902, 896 A.2d 104

*ford* v. *Commissioner of Correction*, 285 Conn. 585, 597–98, 940 A.2d 789 (2008) ("The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . Whether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." [Internal quotation marks omitted.]); *State* v. *Ortiz*, supra, 280 Conn. 720 ("a trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error"). With regard to the ultimate relief at issue, we note that, unlike subsection (c) of § 54-102kk, which sets forth circumstances under which the trial court "may" order DNA testing if certain conditions are met, subsection (b) of that statute provides that the court "shall" order testing if the petitioner has met the conditions stated therein. See footnote 1 of this opinion. This difference in terminology indicates a nondiscretionary decision upon such proof. See *State* v. *Bell*, 283 Conn. 748, 799–800, 931 A.2d 198 (2007); see also *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 252 Conn. 115, 122, 742 A.2d 1257 (2000). Indeed, the state agrees that if satisfied, § 54-102kk (b) would require DNA testing.

The record reflects the following additional undisputed facts relevant to this issue.[19] D'Abreau testified

(2006); which generally will be the same judge who presided over the criminal trial. In the present case, however, we need not decide whether the additional deference enunciated in *Ortiz* applies to appellate review of petitions under § 54-102kk because the trial judge who reviewed the petition in the present case did not preside over the criminal trial or sentencing.

[19] We note that the petitioner did not make the full criminal trial record part of the record in this appeal. Our review, therefore, is based on the limited portions of the trial transcript that the petitioner included in the record. We note that, in a closer case, the presence or absence of a more complete record could have significant bearing on the reasonable probability determination.

at both the petitioner's probable cause hearing and at the trial that he had witnessed the shooting. At the probable cause hearing, D'Abreau testified that, just before the shooting, the petitioner had been wearing a three-quarter length leather coat that D'Abreau had loaned the petitioner, jeans, a dark sweater, and a dark knit hat. He also testified that he had observed the petitioner, while still wearing the same clothing, shoot the victim multiple times in and around the driveway of 315 Winthrop Avenue. In addition, D'Abreau testified that, after the shooting, he had seen a black knit cap in a nearby alley. The alley was part of a route that the petitioner previously had shown D'Abreau to use to avoid the police.

At trial, D'Abreau again testified that the petitioner had worn black boots, blue jeans, a dark sweater, a three-quarter length jacket and a dark cap on the night of the shooting. He testified that he had observed the shooting from the fourth floor of an apartment building across the street from 315 Winthrop Avenue. From this vantage point, he had recognized the petitioner as the shooter in part because the petitioner had been wearing a coat that D'Abreau had loaned him. In addition, D'Abreau testified that the group including the petitioner had discussed the dispute over the drug dealing operation and had reached an understanding that, if the disagreement could not be resolved, the petitioner was going to shoot the victim. D'Abreau did not mention, nor was he asked about, seeing a black knit cap in the nearby alley.

Wilson, who also had witnessed the shooting from a fourth floor apartment across the street from 315 Winthrop Avenue, also identified the petitioner as the shooter. Wilson testified that the shooter was wearing a black coat and a black wool knit hat, and that she had seen the petitioner wearing the same black coat and black hat earlier in the evening. Wilson also testified

that she had recognized the petitioner as the shooter because she had seen the petitioner argue with the victim earlier in the evening and previously had observed him in the neighborhood.

The state introduced the black hat into evidence through the testimony of Detective Robert Benson of the New Haven police department, who had processed the crime scene. Benson testified that he had recovered a black knit cap with two holes in it from the driveway of 315 Winthrop Avenue along with a set of keys and shell casings. He also testified that he had taken photographs of a trail of blood droplets at the scene. The police incident report described the cap as a "black ski-type hat (two holes in same and bloodied)." According to Benson, the hat was located in the driveway, approximately twenty-two feet away from the road.

The petitioner essentially claims that the state presented strong evidence that the shooter wore the black hat that was found in the driveway of 315 Winthrop Avenue, and, that accordingly, testing of that hat revealing DNA matching neither the petitioner nor the victim would constitute exculpatory, material evidence under § 54-102kk (b). The state counters that "any connection between the cap seized from the crime scene and the cap that the shooter had been wearing during the attack was tenuous at best" because, inter alia, the state never argued to the jury that the hat recovered in the driveway was indeed the one worn by the shooter, and no witness testified about seeing the hat fall off of the shooter's head.

Although the petitioner does not frame this claim as a challenge to the trial court's findings of fact,[20] the

[20] The petitioner also asserts that the following factual findings by the trial court were imprecise: (1) that the victim died in the driveway of 315 Winthrop Avenue; and (2) that the shooter chased the victim down the driveway. The petitioner contends that the evidence reflects that the victim walked part of the way down Winthrop Avenue before collapsing, and that

factual predicate of his claim contradicts the trial court's determination that the petitioner failed to demonstrate that the hat at issue belonged to the shooter. See footnote 17 of this opinion. Our review of the record indicates that the link between the hat recovered in the driveway and the hat worn by the shooter is, at best, tenuous. As a preliminary matter, we note that the hat introduced into evidence is a generic, black knit ski cap with no particular distinguishing features. Although the petitioner contends that it was the state's position at trial that the hat recovered in the driveway was indeed the one worn by the shooter, the petitioner has not provided this court with any record to support this contention. Moreover, the state claims that the hat simply was introduced as evidence recovered from the crime scene, along with a set of unidentified keys and shell casings. Finally, although the fact that the hat was bloodied, had holes and was found near the victim could have supported an inference that it was the victim's hat, there is no indication that either the petitioner or the state elicited testimony at trial as to whether the victim was wearing a hat. In light of these facts, the hat may have belonged to the shooter, to the victim, or to a third party. The trial court therefore reasonably determined that the petitioner had not established a conclusive link between the hat introduced at trial and the hat worn by the shooter.

Having determined that any connection between the black hat recovered by the police and the shooter is inconclusive, we next note the strong evidence, entirely unrelated to the hat, identifying the petitioner as the shooter. At trial, the petitioner was identified as the shooter by two witnesses, neither of whom relied solely on the hat in making their identification. D'Abreau, who

the victim chased the shooter down the driveway. Because these facts are collateral to the materiality of the evidence relating to the hat, we need not address whether these findings were entirely correct.

was well acquainted with the petitioner at the time of the shooting, based his identification of the petitioner primarily on the fact that the shooter was wearing the coat that D'Abreau had loaned the petitioner earlier in the evening. Wilson identified the petitioner`as the shooter by the clothing worn as well as by her prior observations of him earlier that night and in the neighborhood on other occasions. See *State* v. *Dupigney*, supra, 78 Conn. App. 116, 121. The jury also had Padmore's tape-recorded statement to the police identifying the petitioner as the shooter, as well as his identification of the petitioner as the shooter during a photographic array. Id., 120–21. Padmore was familiar with the petitioner through his participation in the drug enterprise, and had been walking with the victim immediately before the shooting. Id., 112, 114. Second, there was ample evidence of the petitioner's dual motives for shooting the victim: (1) to settle a dispute over drug territory; and (2) in retaliation for the victim's earlier assault of the petitioner. See id., 112–14.

Section 54-102kk (b) (1) directs us to analyze reasonable probability based on exculpatory results being obtained from DNA testing. Accordingly, we consider the effect of the most favorable result possible from DNA testing of the evidence, which, in this case, would show that biological material found on the hat belonged to neither the petitioner nor the victim. Nonetheless, in light of the uncertain provenance of the black hat and the strong evidence, including the testimony of three eyewitnesses, that the petitioner shot the victim, the absence from trial of even the most favorable result possible from a DNA test—that biological material from the hat belonged to neither the victim nor the petitioner—does not undermine our confidence in the fairness of the verdict. We therefore conclude that the trial court properly determined that the petitioner had failed to meet the requirement of § 54-102kk (b) (1). Compare

*Matheney* v. *State*, 834 N.E.2d 658, 663–64 (Ind. 2005) (denying motion for DNA testing under statute imposing reasonable probability standard when results would not be more favorable to petitioner than previous testing and evidence that petitioner committed murder was "overwhelming"); *Willacy* v. *State*, 967 So. 2d 131, 145 (Fla. 2007) (denying motion for DNA testing under statute imposing reasonable probability standard when state presented "plethora of other evidence upon which the jury could have based its decision in convicting [the defendant] of [the victim's] murder"), cert. denied, 552 U.S. 1265, 128 S. Ct. 1665, 170 L. Ed. 2d 368 (2008).

The decision is affirmed.

In this opinion the other justices concurred.