## STATE OF CONNECTICUT *v.* VANCE SOLMAN
## (AC 32617)

DiPentima, C. J., and Lavine and Espinosa, Js.

Argued September 6—officially released October 25, 2011

*Damon A. R. Kirschbaum,* for the petitioner (appellant).

*Lisa A. Riggione,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Sean P. McGuinness,* deputy assistant state's attorney, for the state (appellee).

*Opinion*

LAVINE, J. In this case, we are called on to decide whether the petitioner, Vance Solman, has satisfied the threshold requirement of the postconviction DNA testing statute, General Statutes § 54-102kk (a), that "[t]he petitioner shall state under penalties of perjury that . . . the evidence sought to be tested contains biological evidence" in order to obtain DNA testing of evidence in the state's possession.[1] We agree with the trial court that the petitioner has not satisfied this requirement because he failed to provide sufficient factual support for the contention that the evidence contains biological material.

The petitioner appeals following the denial of his petition for DNA testing of a live .22 caliber bullet, which was found at the scene of the crime that led to his underlying criminal conviction. On appeal, the

[1] If a petitioner satisfies subsection (a) of § 54-102kk, then the petitioner also must satisfy either subsection (b) or subsection (c) to be entitled to DNA testing of the evidence.

petitioner claims that the trial court improperly concluded that he failed (1) to satisfy the threshold requirement of § 54-102kk (a) that "the evidence sought to be tested contains biological evidence" and (2) to establish that a reasonable probability exists that he would not have been prosecuted or convicted if exculpatory results obtained through DNA testing had been available at his criminal trial.[2] We affirm the judgment of the trial court.

Following a jury trial, the petitioner was convicted of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 and criminal possession of a firearm in violation of General Statutes (Rev. to 1997) § 53a-217. *State* v. *Solman*, 67 Conn. App. 235, 236, 786 A.2d 1184 (2001), cert. denied, 259 Conn. 917, 791 A.2d 568 (2002). On January 15, 1999, the court sentenced the petitioner to a total effective term of forty years imprisonment. The petitioner directly appealed to this court, and this court affirmed his conviction. Id., 243.

The jury reasonably could have found the following facts. "In September, 1997, the victim and his wife were employed at a McDonald's restaurant in Branford and became acquainted with the [petitioner], who was employed at a nearby Mobil gas station. The [petitioner's] nephew also was employed at the Mobil station and became friendly with the victim's wife. That friendship eventually progressed to the point where the victim felt that it was necessary to intervene and, accordingly, he told the [petitioner's] nephew to leave his wife alone. The victim's brother-in-law also confronted the nephew and recommended a curtailment of the relationship.

---

[2] Because we affirm the court's finding that the petitioner did not satisfy the threshold requirement of § 54-102kk (a), we need not address the petitioner's second claim.

"Shortly after midnight, on September 24, 1997, as he lay in bed with his wife and child, the victim heard a loud banging at the back door of their apartment. The victim walked to the kitchen to investigate the disturbance when the [petitioner] burst through the door and shot the victim several times before fleeing. Ten .22 caliber shell casings were found at the scene along with a live round. The [petitioner] was apprehended thereafter . . . ." Id., 236–37.

On June 3, 2010, the petitioner filed a postconviction petition for DNA testing of the live .22 caliber bullet recovered from the crime scene, pursuant to § 54-102kk. The petitioner alleged that the bullet was in evidence, it was capable of being subjected to DNA testing, it had not previously been subjected to DNA testing, and there was a reasonable probability that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing of the bullet.

On June 30, 2010, the trial court held a hearing on the petition, during which counsel for the petitioner explained that the petitioner was seeking "touch DNA" testing of the bullet to support his claim that the petitioner's nephew had committed the shooting, rather than the petitioner. Counsel for the petitioner described touch DNA testing as "a procedure for testing really microscopic DNA evidence." Counsel further explained that "[w]hen human beings touch objects, we leave skin cells on those objects."[3]

---

[3] A stipulation entered into by the petitioner and the state also described touch DNA testing as follows: "(1) 'Touch DNA' testing involves the testing of biological evidence sometimes left on objects when someone touches an object. (2) The Connecticut State Police Forensic Science Laboratory has had the technology to conduct 'touch DNA' testing since 1998. (3) The Connecticut State Police Forensic Science Laboratory has been authorized to conduct 'touch DNA' testing for cases since 1999. (4) The law enforcement community started routinely requesting 'touch DNA' testing in the last [eighteen] months to two years . . . ."

At the hearing, however, the petitioner stipulated that it was unlikely that the bullet actually contained any testable biological material. The stipulation submitted by the parties stated in relevant part: "(5) It is possible that DNA evidence could be obtained from the live .22 caliber bullet that is in evidence. (6) There is a low probability that DNA evidence could be obtained from the live .22 caliber bullet that is in evidence. (7) There is a high probability that any relevant DNA evidence from the live .22 caliber bullet has been contaminated." Counsel for the petitioner stated on the record that the stipulation was based on information provided by a criminalist in the state police forensic science laboratory.

Throughout the hearing, the court stated it was concerned that the petitioner failed to satisfy subsection (a) of § 54-102kk. Counsel for the petitioner responded by arguing that the statute does not require petitioners to "say [with] absolute certainty" that the evidence contains biological material because that would be impossible to establish without first conducting a DNA test of the evidence, and such a requirement would defeat the purpose of the statute. Instead, the petitioner contended that § 54-102kk (a) requires merely that the petition be filed in good faith.[4] The court stated that it was satisfied that the petition was filed in good faith but explained that it would have to "research whether I feel that it has to be established that the item contains biological evidence before I can proceed."

On July 6, 2010, the court denied the petition for DNA testing of the bullet. The order stated in relevant part:

---

[4] Counsel for the petitioner also argued that because there was "no real dispute that someone touched [the bullet] and at least a reasonable probability or some possibility that there is DNA material on it, I think that, that satisfies the statutory requirement . . . ." The trial court responded: "Well, wouldn't that be true of just about every piece of evidence at the scene of a crime, that it's a possibility that somebody would have had touching that would result in biological evidence?"

"[The] [p]etitioner fails to satisfy the statutory condition that 'the evidence sought to be tested contains biological evidence.' Here, there is no evidence that the bullet contains biological evidence; only a 'possibility' that biological evidence could be obtained; and a 'high probability' that any such evidence obtained would be contaminated. . . . If the above stated statutory language is to have any meaning, this petition must fail."[5] (Citation omitted.)

On appeal, the petitioner claims that the court erroneously concluded that he failed to satisfy § 54-102kk (a). The petitioner argues that, contrary to the trial court's analysis, § 54-102kk (a) merely requires that "petitions must be accompanied by statements under oath that the petitions are being filed in good faith." As a matter of first impression, we disagree with the petitioner that § 54-102kk (a) requires only a good faith assertion that the evidence contains biological material and conclude that the petition must be supported by a reasonable basis in fact. Accordingly, we conclude that the petitioner failed to satisfy this standard in light of the parties' stipulation.

The petitioner's claim "presents a question of statutory construction, over which our review is plenary. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek

---

[5] The court also denied the petition on the ground that "even if 'touch DNA' evidence was obtained consistent with the DNA of [the] petitioner's nephew (the alleged, real perpetrator according to the petitioner), such evidence would not 'undermine confidence in the outcome' of the trial; *State* v. *Dupigney*, 295 Conn. 50, 64 [988 A.2d 851] (2010)"; because "the trial evidence of [the] petitioner's guilt was overwhelming" and "evidence that [the] petitioner's nephew handled the ammunition in some capacity would not be inconsistent with the state's evidence that [the] petitioner did the shooting." As previously noted, we do not address this portion of the court's order because we affirm its judgment on the basis of the petitioner's failure to satisfy the threshold requirement of § 54-102kk (a).

to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . In addition, common sense must be used in statutory interpretation, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Citations omitted; internal quotation marks omitted.) *Komondy* v. *Zoning Board of Appeals*, 127 Conn. App. 669, 676, 16 A.3d 741 (2011).

We begin our analysis with the language of the statute. Section 54-102kk (a) provides: "Notwithstanding any other provision of law governing postconviction relief, any person who was convicted of a crime and sentenced to incarceration may, at any time during the term of such incarceration, file a petition with the sentencing court requesting the DNA testing of any evidence that is in the possession or control of the Division of Criminal Justice, any law enforcement agency, any laboratory or the Superior Court. *The petitioner shall state under penalties of perjury* that the requested testing is related to the investigation or prosecution that resulted in the petitioner's conviction and *that the evidence sought to be tested contains biological evidence.*" (Emphasis added.) Subsections (b) and (c) delineate the substantive requirements that a petitioner must meet in order to actually obtain DNA testing, namely, establishing that there is a "reasonable probability" that

the petitioner would not have been prosecuted or convicted, or that the verdict or sentence would have been different, if the testing had been conducted before trial. See *State* v. *Dupigney*, 295 Conn. 50, 64, 988 A.2d 851 (2010) (construing " 'reasonable probability' " requirement under § 54-102kk [b] [1] to mean "a probability sufficient to undermine confidence in the outcome" of the underlying conviction).

The petitioner contends that § 54-102kk (a) cannot be read to require petitioners "to state under oath that microscopic biological material is definitely present on particular evidence . . . ." According to the petitioner, this requirement would frustrate the purpose of the statute, which "is to provide a mechanism to allow inmates to obtain DNA testing of biological evidence to prove they are innocent." The petitioner argues that because subsections (b) and (c) already contain substantive requirements for obtaining DNA testing, an additional condition mandating scientific certainty would impose too high a bar on petitioners and, thus, could not have been intended by the legislature. Additionally, the petitioner argues that such a requirement would encourage perjury because a petitioner would not be able to guarantee that evidence contains biological material prior to the actual DNA test, especially when seeking touch DNA testing. Rather, the petitioner argues that § 54-102kk (a) simply requires that the petitions be filed in good faith. The state argues that the statute clearly and unambiguously requires that the petitioner provide a threshold statement that the evidence contains biological material, which, according to the state, the petitioner failed to do.

As directed by § 1-2z, we must determine whether the language of § 54-102kk (a) is plain and unambiguous and does not lead to unworkable results. As a preliminary matter, we find that the language of § 54-102kk

(a) is susceptible to more than one reasonable interpretation. It is unclear from the face of the statute whether, for example, a petitioner satisfies this requirement by simply stating that the petitioner has a good faith belief that biological material is present; by stating that the petitioner is certain that biological material is definitely present; or by making some preliminary showing supported by facts. See *Bennett* v. *New Milford Hospital, Inc.*, 300 Conn. 1, 15, 12 A.3d 865 (2011) (noting "the relatively low threshold necessary to establish ambiguity for purposes of statutory interpretation, namely, the existence of more than one 'reasonable' reading for the statute"). Therefore, in accordance with § 1-2z, we may consider extratextual guidance in our search to ascertain the meaning of the statute.

In light of principles of statutory construction and the legislative policy behind § 54-102kk, we conclude that the petitioner's proposed good faith standard could not have been intended by the legislature. It is axiomatic that "the legislature did not intend to enact meaningless provisions. . . . Accordingly, care must be taken to effectuate all provisions of the statute. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *Zoning Board of Appeals* v. *Freedom of Information Commission*, 66 Conn. App. 279, 285, 784 A.2d 383 (2001). The petitioner's good faith standard would reduce the language of § 54-102kk (a) requiring that "the evidence sought to be tested contains biological evidence" to mere surplusage. We conclude that by including this language, the legislature intended to create a requirement that there be a factual basis to conclude that biological material is present on the evidence prior to testing. A good faith standard creates an insufficient threshold.

In *State* v. *Dupigney*, supra, 295 Conn. 64–67, our Supreme Court, in construing § 54-102kk (b) (1), identified the various policy interests related to the statute. After explaining that the statute was enacted as part of a broader piece of legislation "intended to use DNA testing both to better identify and punish offenders as well as to prevent wrongful convictions"; id., 64–65; the court linked the statute to a "nationwide movement"; id., 65; of postconviction DNA testing legislation. Id., 65–66. The court noted that, in order to "reconcile . . . competing interests, legislatures have imposed various threshold showings . . . ." Id., 67. Among the important state interests that conditioning access to DNA evidence serves are "respect for the finality of court judgments and the efficient use of limited state resources." Id., 66. The interest in the efficient use of state resources is especially applicable in a situation like this case, where the petitioner seeks touch DNA testing of a physical object recovered from the crime scene. We agree with the trial court that a standard like the one the petitioner proposes would deprive the statute of meaning and would require that virtually every piece of evidence in the state's possession be subjected to DNA testing, provided the petitioner could satisfy subsection (b) or (c) of § 54-102kk. See footnote 4 of this opinion.

We agree with the petitioner, however, that a construction of the statute requiring petitioners to state with certainty that the evidence sought to be tested contains biological material would lead to unworkable results and, thus, also could not have been intended by the legislature. It would be impossible for petitioners to be sure that biological material is present without conducting an extensive inquiry. Accordingly, petitioners willing to risk perjury would satisfy § 54-102kk (a), while honest petitioners would not. Therefore, "[m]indful that we must avoid a construction that fails to attain a rational and sensible result"; *Komondy* v. *Zoning*

*Board of Appeals,* supra, 127 Conn. App. 683; we reject a construction that would require petitioners to state that biological material is incontrovertibly present. We recognize, in light of the purpose of the statute, that the threshold requirement of § 54-102kk (a) should not be unduly demanding.

In accordance with the above analysis, we conclude that in order to satisfy § 54-102kk (a), a petitioner must make a preliminary showing supported by a reasonable basis in fact that the evidence sought to be tested likely contains biological material.[6] We trust our trial courts to evaluate the facts and circumstances presented on a case-by-case basis.

Applying this standard to the present case, we conclude that the petitioner falls short. As noted, the stipulation submitted by the parties to the trial court stated that "[t]here is a low probability that DNA evidence

---

[6] We note that Texas has established a similar standard in construing its postconviction DNA testing statute. See *Vollemans* v. *Wallingford,* 103 Conn. App. 188, 196, 928 A.2d 586 (2007) ("[w]here the meaning of a statute is in doubt, reference to legislation in other states and jurisdictions which pertains to the same subject matter, persons, things, or relations may be a helpful source of interpretative guidance" [internal quotation marks omitted]), aff'd, 289 Conn. 57, 956 A.2d 579 (2008).

In *Swearingen* v. *State,* 303 S.W.3d 728, 732 (Tex. Crim. App. 2010), the Texas Court of Criminal Appeals construed article 64.01 (a) of the Texas Code of Criminal Procedure, which provides in relevant part: "A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material." The court first noted that "[a] literal reading of the statute unequivocally mandates that all evidence to be tested must first be proven to contain biological material." *Swearingen* v. *State,* supra, 732. The court recognized, however, that such a reading "could lead to the deprivation of DNA testing in the rare case simply because of the inability to ascertain whether or not biological material exists." Id. The court then stated that an appellant must "provide facts in support of his motion"; id.; and that "a mere assertion or a general claim that existence of biological material is probable will fail to satisfy the appellant's burden." Id. In concluding that the appellant did not satisfy this standard, the court noted that "no expert testimony or scientific data was presented to support the conclusion that DNA would necessarily be deposited through grasping with strong force." Id., 733. Although the language of the Texas statute

could be obtained from the live .22 caliber bullet that is in evidence" and "a high probability that any relevant DNA evidence from the live .22 caliber bullet has been contaminated." While the stipulation was based on information provided by someone knowledgeable as to DNA evidence,[7] the contents of the statements provide inadequate support for the assertion that the bullet contains biological material which could be tested for DNA, as required by § 54-102kk (a).

To the extent that the petitioner argues that there is a possibility that the bullet contains biological material because the bullet had to have been touched by someone; see footnote 4 of this opinion; we note that a petitioner's contention "must rest upon more than surmise or conjecture. . . . A trier is not concerned with possibilities but with reasonable probabilities." (Internal quotation marks omitted.) *Milliun* v. *New Milford Hospital*, 129 Conn. App. 81, 100, 20 A.3d 36, cert. granted on other grounds, 302 Conn. 920, 28 A.3d 338 (2011); see also *Curran* v. *Kroll*, 118 Conn. App. 401, 410, 984 A.2d 763 (2009) ("[i]nferences should be based on probabilities, not possibilities, surmise, or conjecture" [internal quotation marks omitted]), cert. granted on other grounds, 295 Conn. 915, 990 A.2d 866 (2010); *Daigle* v. *Metropolitan Property & Casualty Ins. Co.*, 60 Conn. App. 465, 469, 760 A.2d 117 (2000) ("[i]n assessing damages in a tort action, the trier is not concerned with possibilities but with reasonable probabilities" [internal quotation marks omitted]), aff'd, 257 Conn. 359, 777 A.2d 681 (2001). We therefore conclude that the trial court properly determined that the petitioner failed to satisfy § 54-102kk (a).

The judgment is affirmed.

In this opinion the other judges concurred.

---

at issue in *Swearingen* is different from § 54-102kk, we find the court's analysis pertinent.

[7] Counsel for the petitioner stated that the information contained in the stipulation was obtained from "one of the criminalist[s] that handles the DNA testing at the state police crime lab . . . ."