STATE OF CONNECTICUT *v.* SUNRISE HERBAL REMEDIES, INC., ET AL.

STATE OF CONNECTICUT *v.* DAVID HOFFMAN ET AL.
(SC 18371)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 18—officially released June 8, 2010

*Robert W. Clark*, assistant attorney general, with whom were *Phillip Rosario*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Brendan T. Flynn* and *Jose Rene Martinez Onofre*, assistant attorneys general, for the appellant (state).

*James W. Oliver*, with whom, on the brief, was *Sylvia M. Ho*, for the appellees (named defendant et al. in each case).

*Thomas A. Kaelin*, for the appellee (intervening defendant Wachovia Bank, N.A.).

*Opinion*

KATZ, J. The plaintiff, the state of Connecticut, appeals from the decision of the trial court granting the motions of the defendants, Valerie Hawk-Hoffman and

David Hoffman,[1] to dissolve prejudgment attachments originally filed against their property on which the intervening defendant Wachovia Bank, N.A. (Wachovia), had held a mortgage.[2] The state claims that the trial court improperly concluded that it lacked subject matter jurisdiction over the applications for those attachments because the applications had not complied with the requirements of General Statutes § 52-278e (a).[3] Specifically, the state claims that the trial court improperly concluded that the applications for the prejudgment attachments were invalid because they had not been accompanied by affidavits from a "competent affiant" as required under § 52-278e (a). We agree with the state, and, accordingly, we reverse the decision of the trial court.

The record reflects the following undisputed facts. This appeal arises from an enforcement action brought

---

[1] We note that, although one of the complaints in these consolidated cases also named Sunrise Herbal Remedies, Inc., and Sage Advice, Inc., as defendants, those companies were not parties in the attachment proceedings at issue. Therefore, in this opinion we refer to Hawk-Hoffman and Hoffman as the defendants.

[2] The state appealed from the decision of the trial court to the Appellate Court, and we thereafter granted Wachovia's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[3] General Statutes § 52-278e (a) provides: "The court or a judge of the court may allow the prejudgment remedy to be issued by an attorney without hearing as provided in sections 52-278c and 52-278d upon the filing of an affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff and that there is reasonable likelihood that the defendant (1) has hidden or will hide himself so that process cannot be served on him or (2) is about to remove himself or his property from this state or (3) is about to fraudulently dispose of or has fraudulently disposed of any of his property with intent to hinder, delay or defraud his creditors or (4) has fraudulently hidden or withheld money, property or effects which should be liable to the satisfaction of his debts."

by the state, at the request of the commissioner of consumer protection, pursuant to General Statutes § 42-110m (a)[4] of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., against Hawk-Hoffman, Sunrise Herbal Remedies, Inc. (Sunrise), and Sage Advice, Inc. (Sage). In that action, the state alleged that Hawk-Hoffman was the principal of Sunrise and Sage, and that, in that capacity, she had directed, controlled and participated in various unfair or deceptive acts in violation of General Statutes § 42-110b (a) in connection with the sale of herbal products.

Subsequent to filing the CUTPA action, the state filed an ex parte application for a prejudgment remedy pursuant to § 52-278e (a). Specifically, the state sought an attachment of a parcel of Hawk-Hoffman's real property located adjacent to 35 Codfish Hill Road in Bethel, in order to secure at least $1,391,000, representing $91,000 in restitution and $1,300,000 in civil penalties on the basis of 260 alleged wilful violations of CUTPA. The application was accompanied by an affidavit signed by Assistant Attorney General Matthew F. Fitzsimmons, in which he averred, inter alia, that the state had received 260 consumer complaints or inquiries about the business practices of Hawk-Hoffman, Sunrise and Sage, reporting an average consumer loss of approxi-

---

[4] General Statutes § 42-110m (a) provides: "Whenever the commissioner has reason to believe that any person has been engaged or is engaged in an alleged violation of any provision of this chapter said commissioner may proceed as provided in sections 42-110d and 42-110e or may request the Attorney General to apply in the name of the state of Connecticut to the Superior Court for an order temporarily or permanently restraining and enjoining the continuance of such act or acts or for an order directing restitution and the appointment of a receiver in appropriate instances, or both. Proof of public interest or public injury shall not be required in any action brought pursuant to section 42-110d, section 42-110e or this section. The court may award the relief applied for or so much as it may deem proper including reasonable attorney's fees, accounting and such other relief as may be granted in equity. In such action the commissioner shall be responsible for all necessary investigative support."

mately $362. The affidavit also stated that, prior to the commencement of the action, the state had served Hawk-Hoffman with a civil investigative demand, and that, after receiving the demand and discussing her responses with the state, Hawk-Hoffman had dissolved Sunrise and transferred her interest in 35 Codfish Hill Road in Bethel by quitclaim deed to Hoffman, her husband. The trial court, *Miller, J.*, granted the ex parte application.

The state in a separate action also filed a complaint against the defendants alleging fraudulent conveyance in connection with the transfer of the 35 Codfish Hill Road property, and an application for an ex parte prejudgment remedy seeking an attachment on that property. This application was accompanied by an affidavit from Fitzsimmons setting forth details of the underlying CUTPA action and the alleged fraudulent transfer. The trial court, *Wiese, J.*, granted that ex parte application as well.

Prior to the attachments, the Bethel properties had been encumbered by two mortgages; Wachovia held the first mortgage and IndyMac Bank held the second mortgage. Following the execution and recording of the state's attachments, the defendants executed a third mortgage with Wachovia on the Bethel properties.[5] After Wachovia and IndyMac Bank instituted foreclosure actions against the properties, an agreement was reached among the state, the defendants and Wachovia, according to which the properties would be sold, the proceeds of the sale would be used to pay off the mortgages on the property entered before the state's attach-

---

[5] Although there is nothing in the record expressly indicating whether the mortgage encumbered the 35 Codfish Hill Road property, the adjacent property or both, we presume that it encompassed both properties because the state's attachments on both properties were substituted with an attachment on an escrow account containing the balance of the proceeds of the sale from both properties.

ments and Wachovia would be permitted to intervene as an interested party in the proceedings relating to those attachments. In accordance with the parties' agreement, the balance of the proceeds was placed in an escrow account and the trial court ordered the substitution of the state's attachments on the property with attachments on the contents of the escrow account.

Thereafter, in accordance with § 52-278e (d),[6] the defendants and Wachovia moved to dissolve the attachments on the ground that the applications were fatally defective and, therefore, that the court lacked subject matter jurisdiction over the attachments. Specifically, they contended that the affidavits were not supported by personal knowledge and, therefore, had not been filed by a competent affiant, as required by § 52-278e (a). The state thereafter filed a "substitute affidavit in support of the application for an ex parte [prejudgment remedy]" from Patrick M. Ahlquist, an investigator in the office of the attorney general, to which the defendants objected as unauthorized under, and in contravention of, the prejudgment remedy scheme.

The court scheduled a consolidated evidentiary hearing to consider the jurisdictional issue. At the hearing, Fitzsimmons testified that he had acquired personal knowledge of the facts recited in the two affidavits by, inter alia: (1) reading the state's civil investigative

---

[6] General Statutes § 52-278e (d) provides: "A defendant may move to dissolve or modify a prejudgment remedy allowed pursuant to this section by any proper motion or by return to the Superior Court of a signed claim form that indicates, by the checking of a box on the claim form, whether the claim is an assertion of a defense, counterclaim, set-off or exemption, an assertion that any judgment that may be rendered is adequately secured by insurance, an assertion that the amount of the prejudgment remedy is unreasonably high, a request that the plaintiff be required to post a bond to secure the defendant against any damages that may result from the prejudgment remedy, or a request that the defendant be allowed to substitute a bond for the prejudgment remedy."

demand and Hawk-Hoffman's responses thereto; (2) attending a meeting with Hawk-Hoffman and her attorney; (3) reviewing the complaint file, including all documents submitted with the complaints; (4) reviewing the Bethel land records for the Codfish Hill properties at the Bethel town clerk's office; and (5) reviewing the secretary of the state's records for Sunrise.

The trial court treated Fitzsimmons' affidavits as the operative ones in the proceedings and, therefore, did not address the objections to Ahlquist's substitute affidavit. In considering Fitzsimmons' affidavits, the trial court first reasoned that there is a distinction under our case law between properly executed affidavits lacking sufficient facts and invalid affidavits, and concluded that the latter was an improper basis for the court's jurisdiction to grant a prejudgment attachment. The trial court concluded that the affidavits were invalid because Fitzsimmons was not a competent affiant, as required by the statute.[7] See General Statutes § 52-278e (a). Specifically, the trial court noted: "[I]t is clear that evidence has not been introduced sufficient to support a finding that Fitzsimmons had personal knowledge of the matters in the affidavits regarding the consumer complaints. Before making out the affidavits, Fitzsimmons basically reviewed the consumer complaint files."

[7] We note that, in its memorandum of decision, the trial court incorrectly relied upon General Statutes § 52-278c, which governs prejudgment remedies imposed *after* a hearing, rather than § 52-278e, under which the *ex parte* prejudgment remedies originally had been imposed. This distinction is not material in the present case, however, because the provision of § 52-278c on which the trial court had relied is identical to the competent affiant section of § 52-278e (a), which is the only portion of that statute that the defendants had relied on as the basis for their motions. See General Statutes § 52-278c (a) (2) ("[a]n affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff").

The trial court then concluded that "Fitzsimmons' review of the consumer complaint files did not make him a competent affiant of the essential facts. . . . Fitzsimmons lacked personal knowledge of the essential facts supporting the prejudgment attachments. He did not possess the requisite legal qualifications to provide the affidavits in question."[8] Therefore, the trial court determined that it did not have jurisdiction over the state's applications for the ex parte prejudgment attachments, and accordingly granted the motions to dissolve the attachments. This appeal followed.

The state claims that the trial court improperly concluded that it did not have subject matter jurisdiction over the applications for the ex parte prejudgment attachments because Fitzsimmons had personal knowledge of the relevant matters, and the mere fact that the affidavits may have contained some hearsay relating to the consumer complaints did not render the affidavits invalid. The state further contends that, even if that hearsay is deemed improper support for the applications, because the state had met the threshold requirement for a proper affidavit, it was entitled to present further evidence to demonstrate probable cause at a hearing pursuant to § 52-278e (e).[9] In response, the

---

[8] We note that the trial court addressed Fitzsimmons' personal knowledge as to the alleged CUTPA violations, and did not address his knowledge as it related to the alleged fraudulent conveyance. Accordingly, we limit our analysis to his competence as to the alleged CUTPA violations.

[9] General Statutes § 52-278e (e) provides: "The court shall proceed to hold a hearing and determine any motion made under subsection (d) of this section not later than seven business days after its filing. If the court determines at such hearing requested by the defendant that there is probable cause that judgment will be rendered in the matter in favor of the plaintiff and, if the plaintiff has relied on a ground set forth in subsection (a) of this section, that there is probable cause to believe such ground exists, the prejudgment remedy granted shall remain in effect. If the court determines there is no probable cause to believe that a judgment will be rendered in the matter in favor of the plaintiff or, if a ground set forth in subsection (a) of this section was relied on, to believe such ground exists, the prejudgment remedy shall be dissolved. An order shall be issued by the court setting forth the action it has taken."

defendants and Wachovia claim that the trial court properly concluded that Fitzsimmons was not a competent affiant.[10] Wachovia further contends that the interpretation of § 52-278e (a) advanced by the state would violate due process because it would allow ex parte prejudgment attachments to be imposed on the basis of conclusory allegations and hearsay, rather than facts. We agree with the state that Fitzsimmons was a competent affiant and, therefore, that the trial court must conduct a hearing to determine whether there is probable cause to maintain the attachments. We further conclude that Wachovia's due process claim is inadequately briefed.

---

[10] Wachovia has asserted additional claims that we do not decide on the merits. Specifically, Wachovia contends that the substitution of Ahlquist's affidavit for Fitzsimmons' affidavits deprived the trial court of subject matter jurisdiction because, by filing the substitute affidavit, the state effectively withdrew the initial affidavits and thus rendered the attachment invalid. There are two problems with this claim. First, Wachovia provides no case law support for the proposition that the mere filing of a substitute affidavit withdraws an initial affidavit, irrespective of the filing party's intent or the validity of the original affidavit. The cases cited by Wachovia address entirely different issues. Second, it is unclear whether the state intended to withdraw the initial affidavit or the trial court viewed the state's action as such an attempt. Indeed, because the trial court limited its decision to Fitzsimmons' affidavits and any discrepancies or additions between those affidavits and Ahlquist's affidavit can be attributed to the ongoing nature of the CUTPA investigation, the trial court reasonably may have viewed the "substitute" affidavit as functionally a supplemental affidavit.

Wachovia also claims that, even if the court had subject matter jurisdiction, Fitzsimmons' affidavits were insufficient to establish probable cause on the date that the attachments were issued and, therefore, Wachovia's interest in the property is superior to that of the state. This claim is not ripe for our review because the trial court did not reach the issue of whether the state, if the affidavits had been proper, had established probable cause sufficient to maintain the attachments on the defendants' property. Consistent with this opinion, we leave that claim to be raised in the trial court on remand, and, therefore, we decline to review it at this juncture. See *State* v. *Kemah*, 289 Conn. 411, 436, 957 A.2d 852 (2008) (claim presupposing trial court decision on remand not ripe for review); *Esposito* v. *Specyalski*, 268 Conn. 336, 346, 844 A.2d 211 (2004) (to satisfy ripeness requirement of justiciability, "we must be satisfied that the case before the court does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire" [internal quotation marks omitted]).

I

We first turn to the question of whether the trial court properly determined that it lacked subject matter jurisdiction over the applications for a prejudgment attachment because Fitzsimmons' affidavits were invalid. That determination was predicated on the court's conclusion that Fitzsimmons did not have personal knowledge of the facts in the affidavits and, therefore, was not a "competent affiant" under § 52-278e (a). We conclude that the trial court's conclusion was premised on an incorrect interpretation of that term.

"We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary.[11] . . . Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . ." (Internal quotation marks omitted.) *Sastrom* v. *Psychiatric Security Review Board*, 291 Conn. 307, 314–15, 968 A.2d 396 (2009).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to

---

[11] The defendants and Wachovia claim that the trial court's conclusion that Fitzsimmons had no personal knowledge of the facts regarding the consumer complaints is a factual determination entitled to deference. We disagree. When, as in the present case, a trial court's finding that an affiant or witness lacks personal knowledge rests upon a suspect application of *law*, we employ plenary review. See, e.g., *State* v. *William C.*, 267 Conn. 686, 703 n.18, 841 A.2d 1144 (2004) ("[I]nsofar as the trial court's exclusion of the [department of children and families'] records was based upon its conclusion that the defendant had failed to demonstrate the unavailability of a witness with personal knowledge of the creation of the record or the events contained within the record, the trial court was incorrect as a matter of law. For the purposes of the business records exception to the hearsay rule, the availability of a witness with such personal knowledge is immaterial.").

determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . [W]e are mindful of the legislature's directive that, [i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly. General Statutes § 1-1 (a)." (Citation omitted; internal quotation marks omitted.) *State* v. *Dupigney*, 295 Conn. 50, 58–59, 988 A.2d 851 (2010); see also General Statutes § 1-2z.[12] "Words with a fixed legal or judicially settled meaning must be presumed to have been used in that sense. . . . In ascertaining legislative intent [r]ather than using terms in their everyday sense, [t]he law uses familiar legal expressions in their familiar legal sense." (Internal quotation marks omitted.) *State* v. *Dupigney*, supra, 59.

"We are also mindful of the principle that prejudgment remedies are in derogation of the common law and, therefore, that prejudgment remedy statutes must be strictly construed . . . . *Feldmann* v. *Sebastian*, 261 Conn. 721, 725, 805 A.2d 713 (2002); see also *Vitanza* v. *Upjohn Co.*, 257 Conn. 365, 381, 778 A.2d 829 (2001) ([i]n determining whether or not a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of

---

[12] General Statutes § 1-2z directs us to consider "the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." In the present case, the parties do not contend that the pertinent term has a plain meaning, but, instead, draw heavily from extratextual sources concerning prejudgment remedies, generally, and § 52-278e (a), specifically. Accordingly, we do not limit our analysis to the plain language of the statute.

the common law is to be limited to matters clearly brought within its scope . . .)." (Internal quotation marks omitted.) *Cahaly* v. *Benistar Property Exchange Trust Co.*, 268 Conn. 264, 270, 842 A.2d 1113 (2004).

Before turning to the specific meaning of "competent affiant," we note the following background for proper context. Section 52-278e (a) sets forth two requirements that must be satisfied before a court can allow the issuance of an ex parte prejudgment remedy. See footnote 3 of this opinion. The requirement at issue in this appeal is "the filing of an affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought . . . will be rendered in the matter in favor of the plaintiff . . . ." General Statutes § 52-278e (a). A defendant against whom an ex parte prejudgment remedy has been issued may move to dissolve or modify the attachment by following the procedures set forth in § 52-278e (d). See footnote 6 of this opinion. Upon such a motion, the trial court "shall proceed to hold a hearing . . . . If the court determines at such hearing requested by the defendant that there is probable cause that judgment will be rendered in the matter in favor of the plaintiff and, if the plaintiff has relied on a ground set forth in subsection (a) of this section, that there is probable cause to believe such ground exists, the prejudgment remedy granted shall remain in effect. If the court determines there is no probable cause to believe that a judgment will be rendered in the matter in favor of the plaintiff or, if a ground set forth in subsection (a) of this section was relied on, to believe such ground exists, the prejudgment remedy shall be dissolved. . . ." General Statutes § 52-278e (e); see also *Glanz* v. *Testa*, 200 Conn. 406, 409, 511 A.2d 341 (1986) ("the [ex parte prejudgment

remedy] statute guarantees the defendant the opportunity for an immediate post-seizure hearing at which the prejudgment remedy will be dissolved unless the court determines that there is probable cause to sustain the validity of the plaintiff's claim" [internal quotation marks omitted]).[13]

Our case law has addressed two deficiencies that may occur under this scheme: the filing of an application for ex parte attachment with an affidavit that is insufficient, in and of itself, to establish probable cause; and the filing of an application without any supporting affidavit. When an affidavit is merely insufficient to establish probable cause, a plaintiff may introduce additional evidence to buttress the initial affidavit at the probable cause hearing held pursuant to § 52-278e (e). *Glanz* v. *Testa,* supra, 200 Conn. 408–409; see also *Doe* v. *Rapoport,* 80 Conn. App. 111, 117, 833 A.2d 926 (2003); *Lengyel & Lengyel Builders, Inc.* v. *Hill,* 1 Conn. App. 349, 350, 471 A.2d 975 (1984). When a plaintiff provides *no affidavit* with an application for a prejudgment remedy, however, the plaintiff is not entitled to provide support for the initial application at a probable cause hearing. *Lauf* v. *James,* 33 Conn. App. 223, 228–29, 635 A.2d 300

---

[13] We note that *Glanz* involved a previous version of § 52-278e, which the United States Supreme Court declared violative of due process, as applied, in *Connecticut* v. *Doehr,* 501 U.S. 1, 18, 111 S. Ct. 2105, 115 L. Ed. 2d 1 (1991), because the statute did not "at least requir[e] a showing of some exigent circumstance" in the absence of affording a preattachment hearing. The legislature thereafter amended the statute several times. See Public Acts 1990, No. 90-149, § 3; Public Acts 1991, No. 91-315, §§ 1, 5; Public Acts 1993, No. 93-431, §§ 3, 10. Significantly, for our purposes, however, the requirement that a plaintiff or "competent affiant" attest to probable cause to support the attachment has been part of the statute since it was first adopted in 1973, that aspect of the statute was not at issue in *Doehr,* this court has not overruled *Glanz,* and none of the parties suggests that we do so now. We therefore continue to apply the holding of *Glanz* as it relates to the proper procedures by which a plaintiff may demonstrate probable cause to support its application for an attachment. We address the defendants' due process claim as it relates to our construction of that provision of the statute in part II of this opinion.

(1993) (relying on parties' concession that affidavit was so defective that application should be treated as unsupported by *any* affidavit and precluding additional evidence); see also *Davila* v. *Secure Pharmacy Plus*, 329 F. Sup. 2d 311, 313 (D. Conn. 2004) ("[The] [p]laintiff has not submitted an affidavit with either motion, let alone an affidavit that sets forth facts sufficient to demonstrate that there is probable cause that a judgment will enter in favor of [the] [p]laintiff . . . . Instead, [the] [p]laintiff simply states that there is probable cause that a judgment will be rendered in his favor. [The] [p]laintiff has thus failed to comply with . . . General Statutes § 52-278c [a] [2].").

The trial court's determination that it did not have subject matter jurisdiction over the attachments rested upon two conclusions: (1) that Fitzsimmons lacked personal knowledge of the facts relevant to the CUTPA complaints, which rendered the affidavit invalid; and (2) that pursuant to *Lauf*, a plaintiff may not bolster the application when that application under § 52-278e (a) is accompanied by an *invalid* affidavit. We do not address the trial court's second conclusion because we conclude that it improperly determined that Fitzsimmons was not a competent affiant.

"Competent affiant" is a legal term of art, and, because there is no legislative indication to the contrary, the term is presumed to carry its legal meaning in the context of the statute. See *State* v. *Dupigney*, supra, 295 Conn. 58–59. An "affidavit" is defined as "[a] voluntary declaration of facts written down and sworn to by a declarant before an officer authorized to administer oaths" and an "affiant" is "[o]ne who makes an affidavit." Black's Law Dictionary (9th Ed. 2009). "Generally, affidavits must be made on the affiant's personal knowledge of the facts alleged in the petition. The affidavit must in some way show that the affiant is personally familiar with the facts so that he could personally

testify as a witness." 3 Am. Jur. 2d 397, Affidavits § 14 (2002). Black's Law Dictionary (9th Ed. 2009) defines "competence" as "[a] basic or minimal ability to do something; qualification, esp. to testify." See also *Blue Cross & Blue Shield of Connecticut, Inc.* v. *Mike*, 184 Conn. 352, 354, 439 A.2d 1026 (1981) ("The word 'competent' has a number of meanings. One of the definitions is 'legally qualified'; Webster, Third New International Dictionary; or stated another way 'possessing the requisite . . . legal qualifications.' Black's Law Dictionary [5th Ed. 1979]."). These sources indicate that competence denotes a threshold level of basic capacity and ability.

In determining the competence of a witness, it is well established that "[a] person who has no personal knowledge concerning facts about which he or she is asked to testify is not competent to testify about these facts." C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 6.4, p. 301; see also 1 C. McCormick, Evidence (6th Ed. 2006) § 10, p. 47 ("[T]he law prefers that a witness testify to facts, based on personal knowledge, rather than opinions inferred from such facts. One of the earliest and most pervasive manifestations of the common law insistence is the rule requiring that a witness testifying about a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact."). "A distinction should be drawn [however] between a witness who has no personal knowledge and one who has only hearsay knowledge. A person who has no personal knowledge about the subject matter of his or her testimony, i.e., the person is guessing or speculating, is an incompetent witness as to that matter. A witness who is testifying to information that is not admissible in evidence, such as inadmissible hearsay or privileged evidence, is a competent witness as to that matter because he or she has some personal information, but

the evidence is inadmissible because the evidence is incompetent." C. Tait & E. Prescott, supra, § 6.4, p. 301.

These sources indicate that the touchstone of competence is personal knowledge. "Personal knowledge" is variously described as knowledge acquired firsthand or from observation. See Black's Law Dictionary (9th Ed. 2009); 1 C. McCormick, supra, § 10, p. 47. Black's Law Dictionary (9th Ed. 2009) defines "personal knowledge" as "[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." See also Ballentine's Law Dictionary (3d Ed. 1969) ("[P]ersonal knowledge" is defined as: "One's own knowledge. With more accuracy, knowledge derived from the exercise of one's own senses. . . . A person's direct knowledge of anything, as distinguished from that which he learns by hearsay." [Citation omitted.]). Accordingly, the rule that a witness must testify from personal knowledge requires "that a witness testifying about a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed that fact." 1 C. McCormick, supra, § 10, p. 47. As the Second Circuit Court of Appeals has explained: "When A testifies that B told him of an event, A usually has personal knowledge only of *B's report*. It is B who has personal knowledge of the *event*." (Emphasis added.) *United States* v. *Stratton*, 779 F.2d 820, 829 (2d Cir. 1985), cert. denied, 476 U.S. 1162, 106 S. Ct. 2285, 90 L. Ed. 2d 726 (1986).

Determining whether an affiant has personal knowledge requires close examination of the averments set forth in the affidavit, and the character of such averments will depend significantly upon the nature of the underlying action. In the present case, the underlying action was a CUTPA enforcement action initiated by the attorney general on behalf of the commissioner of consumer protection pursuant to § 42-110m (a). See footnote 4 of this opinion. Accordingly, the affidavits at issue set forth the alleged CUTPA violations as repre-

sented in the consumer complaints and inquiries that spurred the action.[14] Fitzsimmons testified that he had

[14] The affidavit in support of the attachment in the CUTPA action provides in relevant part: "3. On or about February 21, 2007, the [s]tate of Connecticut commenced an action against the defendants [Hawk-Hoffman, Sunrise and Sage] . . . pursuant to a Writ, Summons and Complaint dated February 9, 2007. . . .

"8. To date, the [s]tate has received approximately 260 consumer complaints or inquiries regarding the business practices of [Hawk-Hoffman, Sunrise and Sage]. The average consumer loss attributed to [their] unlawful and or deceptive business practices, as reported to the [s]tate by the consumers, is approximately $362.00. . . .

"10. The consumer complaints and inquiries document a course of conduct in which [Hawk-Hoffman, Sunrise and Sage] engaged including, but not limited to, the following unlawful and/or deceptive acts and practices:

"(a) on more than one occasion, [Hawk-Hoffman, Sunrise and Sage] enrolled consumers into an automatic shipping program without first obtaining the consumers' prior expressed authorization;

"(b) on more than one occasion, [Hawk-Hoffman, Sunrise and Sage] failed to fully disclose to consumers the terms and conditions, as well as the method of cancellation of the automatic shipment program prior to the consumers' enrollment into the automatic shipment program;

"(c) on more than one occasion, [Hawk-Hoffman, Sunrise and Sage] enrolled consumers into the automatic shipment program by disguising the enrollment contract as an order form, which did not clearly and conspicuously disclose to the consumers that said form was, in fact, a written agreement to enroll consumers into the automatic shipment program;

"(d) on more than one occasion, [Hawk-Hoffman, Sunrise and Sage] billed the consumers' credit card for unauthorized shipments of herbal products that were initiated through the automatic shipment program without obtaining the consumers' prior expressed authorization;

"(e) on more than one occasion, [Hawk-Hoffman, Sunrise and Sage] failed or refused to accept the return of the untimely shipment of herbal products, causing consumers to be billed for a subsequent automatic shipment cycle despite . . . having received notice from consumers that the shipments were not sent in accordance with the automatic shipment agreement;

"(f) on more than one occasion, [Hawk-Hoffman, Sunrise and Sage] failed or refused to refund to consumers money collected for charge to their credit card account related to the untimely shipment of herbal products despite . . . having received notice that the shipments were not sent in accordance with the automatic shipment agreement;

"(g) on more than one occasion, [Hawk-Hoffman, Sunrise and Sage] failed or refused to cancel customers' request in a timely manner upon receiving proper notice to do so, causing consumers to be billed for a subsequent automatic shipment cycle; and

"(h) [Hawk-Hoffman, Sunrise and Sage] threatened or harassed consumers who disputed or refused to pay for the automatic and unauthorized shipment of herbal products. . . . "

derived personal knowledge of the existence, nature and content of the complaints and inquiries from personally reviewing the complaints and the state's investigative file. From this, the trial court concluded that Fitzsimmons was not competent because he had not observed or experienced the transactions and interactions detailed in those complaints. It is clear, however, that although he lacked personal knowledge to aver to the *truth* of the allegations underlying the complaints, Fitzsimmons nonetheless was competent to represent the *nature and extent* of those complaints. See, e.g., *Gorman v. Wolpoff Abramson, LLC*, 584 F.3d 1147, 1164 (9th Cir. 2009) (party had personal knowledge of contents of credit reports derived from reviewing reports); *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1123 (10th Cir. 2005) ("[The plaintiff] states in her declaration that she reviewed all of the records of audits performed in 2000 and 2001, and she also states that the audits were prepared in a format familiar to her. Thus, insofar as her declaration repeats the reported results of those audits as she reviewed them, it cannot be said that she lacked personal knowledge of those reports."); *In re Japanese Electronic Products*, 723 F.2d 238, 290 (3d Cir. 1983) (Diary entries describing statements made at a board meeting satisfied the personal knowledge requirement because the diarist regularly attended meetings and "[t]he diaries are offered as business

---

The affidavit in support of the application in the fraudulent conveyance action provides in relevant part: "10. From some time prior to May 10, 2005, the [s]tate received consumer complaints regarding, and evidence of, unfair or deceptive business practices of Hawk-Hoffman and her companies [Sunrise and Sage] . . . such as would justify a sovereign enforcement action by the [s]tate against [Hawk-Hoffman, Sunrise and Sage].

"11. To date, the [s]tate has received approximately 260 consumer complaints or inquiries regarding the business practices of [Hawk-Hoffman, Sunrise and Sage]. The average consumer loss attributed to the . . . unlawful and or deceptive business practices, as reported to the [s]tate by the consumers, is approximately $362.00.

"12. The [s]tate continues to receive consumer complaints or inquiries regarding the business practices of [Hawk-Hoffman, Sunrise and Sage]. . . ."

records reflecting what went on at the . . . meetings. Undoubtedly what was said by others in attendance was hearsay as to the truth of what they said about events elsewhere. But the significance of the diaries is as a record of what transpired at the meeting."), rev'd on other grounds sub nom. *Matsushita Electronics Industrial Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

We conclude, therefore, that the trial court improperly determined that Fitzsimmons was not a competent affiant because he lacked personal knowledge of the facts to which he had attested. Accordingly, the trial court improperly concluded that it lacked subject matter jurisdiction over the applications for the prejudgment remedy on that basis.

II

Wachovia contends that this interpretation of the competent affiant requirement violates its constitutional right to due process because it allows a court to issue an ex parte property taking on the basis of hearsay and conclusory allegations and opinions, rather than on facts within the personal knowledge of the affiant. We conclude that Wachovia's claim is inadequately briefed.

The two federal court decisions cited by Wachovia as support for this claim involved *as applied* challenges to procedural aspects of the statute that were unrelated to the probable cause requirement of the statute at issue in the present case. See *Connecticut* v. *Doehr*, 501 U.S. 1, 18, 111 S. Ct. 2105, 115 L. Ed. 2d 1 (1991) (holding that earlier version of § 52-278e, as applied to intentional tort case, had violated due process by authorizing attachment without either prior notice or hearing or showing of extraordinary circumstances); *Shaumyan* v. *O'Neill*, 987 F.2d 122, 127–29 (2d Cir. 1993) (concluding that absence of both predeprivation hearing and require-

ment that plaintiff post security bond was not unconstitutional as applied to contract dispute). Significantly, in each of those cases, the court had applied the three part procedural due process test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to the particular facts of the case.[15] See *Connecticut* v. *Doehr*, supra, 11–12, 18; *Shaumyan* v. *O'Neill*, supra, 126–28. This court has applied that same rubric. See *Sassone* v. *Lepore*, 226 Conn. 773, 782, 629 A.2d 357 (1993) ("[j]ust as the requirements of procedural due process are fact-bound, as a general matter, so they are fact-bound with respect to the requirements for a constitutionally acceptable order of attachment"); id., 780–81 ("The issue that we must address is whether, if a trial court were to find probable cause to order a prejudgment remedy in light of these alleged facts, such an order would violate the defendants' rights to procedural due process. *Connecticut* v. *Doehr*, [supra, 11] . . . instructs us to address this issue by using the tripartite test of *Mathews* v. *Eldridge* [supra, 334–35]."); *Calfee* v. *Usman*, 224 Conn. 29, 36, 616 A.2d 250 (1992) (discussing defendant's claim for prejudgment remedy under three part *Mathews* test). Wachovia has provided no analysis of the *Mathews* factors. Instead, in its brief, Wachovia merely presents a laundry list of superficial factual similarities between the present case and *Doehr* or characterizations of the allegations in Fitzsimmons' affidavits that it contends render the initial prejudgment remedy unconstitutional

---

[15] Under *Mathews* v. *Eldridge*, supra, 424 U.S. 335, "the specific dictates of due process generally [require] consideration of three distinct factors: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

as applied to those facts.[16] We conclude, therefore, that Wachovia's due process claim is inadequately briefed and is deemed to have been waived. See *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 115, 653 A.2d 782 (1995).

We also note that, to the extent that Wachovia's due process claim relies upon the characterization of the affidavits as conclusory or "rife with hearsay," any such claim, whatever its merit, is without factual basis. The trial court strictly limited its analysis to whether Fitzsimmons was a competent affiant under § 52-278e (a). Accordingly, the issue on appeal is similarly conscribed: whether Fitzsimmons satisfied the *competent affiant* requirement in § 52-278e (a) such that the trial court properly could exercise jurisdiction over the applications for prejudgment remedy. We conclude that he did because he had derived personal knowledge of the existence, nature and content of the complaints and inquiries from personally reviewing the complaints and the state's investigative file. The trial court made no probable cause determination, and therefore, had no occasion to consider the nature of the averments in the affidavit and whether they provided proper support for

---

[16] Specifically, Wachovia claims that: "[1] The [state's] affidavit is conclusory and not factual.

"[2] The [state's] affidavit is from an attorney in the [state's] attorney's office and not from a plaintiff or complainant.

"[3] The affidavit is not based upon personal knowledge.

"[4] The affidavit is based upon an attorney's review of hearsay statements.

"[5] The affidavit is merely the opinion of the affiant.

"[6] This case is not a simple single debt or collection case.

"[7] The case is a tort case which, as demonstrated from the testimony of the one complainant who testified, is highly fact specific and sharply disputed.

"[8] This is not just one highly [fact-specific] and highly disputed tort case but at least 260 separate and distinct highly complicated tort cases that are each [fact-specific] and sharply disputed."

the probable cause requirement of the statute; nor does this court do so.[17]

The decision is reversed and the case is remanded for further proceedings.

In this opinion the other justices concurred.

---

[17] It is true that the requirements that a witness or affiant have personal knowledge and the bar against such an individual testifying about hearsay are related concepts, but, as noted in part I of this opinion, the determination of whether an *affiant* is competent is distinct and independent from the determination of whether *evidence* is hearsay. See C. Tait & E. Prescott, supra, § 6.4, p. 301. Accordingly, our conclusion in part I of this opinion has no bearing on whether the affidavits contain hearsay. We also note that it is not clear whether the trial court would conclude that much of the purported hearsay, such as the contents of the consumer complaints, is inadmissible. Compare *Federal Trade Commission* v. *Figgie International, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993) (consumer complaint letters admissible under residual exception to hearsay rule); *Federal Trade Commission* v. *Magazine Solutions, LLC*, United States District Court, Civ. No. 7-692, 2009 U.S. Dist. LEXIS 20629 **4–7 (W.D. Pa. March 16, 2009) (consumer complaints admissible under residual exception to hearsay rule); *Federal Trade Commission* v. *Cyberspace.com, LLC*, United States District Court, Civ. No. 00-1806L, 2002 U.S. Dist. LEXIS 25565 *13 (W.D. Wash. July 10, 2002) (consumer e-mails and letters of complaint admissible under residual exception to hearsay rule) with *Iams Co.* v. *Nutro Products, Inc.*, United States District Court, Civ. No. C-3-00-566, 2004 U.S. Dist. LEXIS 15129 *15 (S.D. Ohio July 26, 2004) (mystery shopper reports not admissible under residual exception to hearsay rule because insufficient circumstantial guarantees of trustworthiness).

* The listing of justices reflects their seniority status on this court as of the date of oral argument.