5 A.3d 518 (2010)
124 Conn.App. 400
In re Addie May NESBITT.
No. 30221.
Appellate Court of Connecticut.
Argued May 27, 2010.
Decided October 12, 2010.
*519 Rachel M. Baird, Hartford, for the respondent (appellant).
Terrence M. O'Neill, assistant attorney general, with whom, on the brief, was Richard Blumenthal, attorney general, for the petitioner (appellee).
DiPENTIMA, C.J., and HARPER and BORDEN, Js.
DiPENTIMA, C.J.
The respondent, Addie May Nesbitt, appeals from the judgment of the trial court denying her motion to dismiss a warrant issued pursuant to General Statutes § 29-38c and further ordering that the respondent's firearms be held by the state for a period of up to one year. On appeal, the respondent argues that (1) the risk warrant and its execution were so defective and contrary to the legislative intent and the requirements of § 29-38c that the cause of action should have been dismissed, and (2) the court improperly placed the burden of proof on her to prove that she was not at imminent risk of personal injury to herself or to others. We affirm the judgment of the trial court.
The following facts are relevant to the respondent's appeal. On May 1, 2008, the respondent and her husband, Robert Nesbitt (Nesbitt), received a copy of a letter dated April 29, 2008, from Robert F. Milano, chief of police of the Torrington police department, to Ryan J. Bingham, mayor of Torrington. According to the letter, the respondent had complained to the Torrington police department several years earlier *520 that she had given birth to two children but that the birth of only one child was recorded and the other child was stillborn. The letter indicated that although the police department thoroughly investigated the initial complaint, it became clear during that investigation and every subsequent review that there was no evidence to support the claim of a second birth. The letter further indicated that the office of the state's attorney and the state medical examiner's office concurred with that finding and that, despite the respondent's insistence to the contrary, the state police would not be pursuing the matter.
Upon receipt of this letter, and apparently under the mistaken belief that by this letter the state police were going to open the investigation, the respondent and Nesbitt went to the state police at Troop L in Litchfield to discuss the matter. Upon arrival, they met with Sergeant Jeffrey Covello,[1] who informed them that the state police did not intend to pursue the matter any further. By her own admission, the respondent then had a "meltdown." According to Covello, after he explained the meaning of the letter to the respondent, she pointed to a bruise on her left arm and indicated that during the prior week, her husband had wrestled a gun out of her hand because she was going to kill herself. The respondent's husband acknowledged to Covello that this was an accurate statement. The respondent told Covello that if the state police were not going to take the case, she had no reason to live. She then ran out the door of the barracks. Believing that the respondent was at risk of harming herself, Covello arranged for an ambulance to be called and for the respondent to be committed to Charlotte Hungerford Hospital in Torrington on an emergency basis.
Thomas J. Grigerik, a state police trooper, accompanied the respondent to the hospital in the ambulance. While at the hospital, Grigerik informed Nesbitt that the respondent's firearms had to be surrendered to the state police. Nesbitt indicated that he would comply with this directive. When Nesbitt informed Grigerik that he had some weapons in their residence as well, Grigerik informed him that those weapons also had to be removed. Nesbitt, Grigerik and another trooper then went to the residence where Nesbitt gave the troopers three weapons that were registered to the respondent. These weapons were brought to the evidence room at the Litchfield barracks. The following day, the evidence officer learned that another firearm registered to the respondent had been surrendered to Autumn Gun Works, Inc., in Goshen by Nesbitt. Grigerik then went to Autumn Gun Works, Inc., where he took possession of that firearm and brought it to the evidence room where it was secured.
On May 6, 2008, Grigerik prepared a search and seizure warrant, pursuant to § 29-38c, for the four weapons that had been seized from the respondent and that were in the evidence room at Troop L.[2] The warrant was signed on May 8, and was executed on May 14, 2008. The respondent then filed a motion to dismiss on the basis of lack of subject matter jurisdiction and insufficiency of process and service of process. Following a hearing, the court denied the motion to dismiss. The court further found, with respect to the *521 warrant, that the state had sustained its burden of proving by clear and convincing evidence that the respondent posed an imminent risk of personal injury to herself; it therefore ordered that the firearms continue to be held for a period of up to one year, until July 23, 2009. The respondent then filed this appeal, claiming that the court should have dismissed the warrant and that the court improperly placed the burden on her to prove that she was not at imminent risk of personal injury to herself or to other individuals. While this appeal was pending, the court's order expired, and the firearms were returned to the respondent.

I
Before addressing the merits of the respondent's appeal, we first determine whether the case has been rendered moot due to the expiration of the court's order and the return of the firearms to the respondent.[3] The state argues that this appeal should be dismissed, as there is no longer any practical relief that can be afforded to the respondent. The respondent counters that this appeal is reviewable under either the collateral consequences doctrine or the capable of repetition, yet evading review doctrine. We agree with the respondent that this appeal satisfies the requirements of the collateral consequences exception to the mootness doctrine.[4]
"[A]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal.... When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot.... However, under this court's long-standing mootness jurisprudence ... despite developments during the pendency of an appeal that would otherwise render a claim moot, the court may retain jurisdiction when a litigant shows that there is a reasonable possibility that prejudicial collateral consequences will occur....
"[T]o invoke successfully the collateral consequences doctrine, the litigant must show that there is a reasonable possibility that prejudicial collateral consequences will occur. Accordingly, the litigant must establish these consequences by more than mere conjecture, but need not demonstrate that these consequences are more probable than not. This standard provides the necessary limitations on justiciability underlying the mootness doctrine itself. Where there is no direct practical relief available from the reversal of the judgment ... the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the litigant some practical relief in the future." (Internal quotation marks omitted.) Putman v. Kennedy, 279 Conn. 162, 169, 900 A.2d 1256 (2006).
*522 The state argues that there is no restraint on the respondent's possession of the pistols and that any suggestion as to any future consequences flowing from the respondent's conduct is purely speculative in nature. The respondent counters that collateral consequences of the trial court's order exist because the notice reinstating her pistol permit specifically indicated that further incidents that call into question her suitability to hold a permit could lead to the permanent revocation of her pistol permit. She further argues that collateral consequences exist due to the notification to the department of mental health and addiction services of the court's order. We agree with the respondent.
General Statutes § 29-28(b)[5] provides, in part, that upon application, the issuing authority may issue a temporary state permit to carry a pistol or revolver within the state, provided that "such person is a suitable person to receive such permit...." A state permit is subject to renewal every five years. General Statutes § 29-30(c). The letter from the department of public safety reinstating the respondent's pistol permit specifically notified the respondent that "[f]urther incidents that call into question your suitability to hold a permit will be investigated and may lead to permanent revocation of the permit." We agree with the respondent that by this letter, the department of public safety notified the respondent that a collateral consequence of the revocation is a state police record that potentially will affect the respondent negatively if and when the question of suitability arises in the future. This potential consequence was explicitly stated in the letter reinstating the respondent's pistol permit; it is, therefore, based on more than mere conjecture. Accordingly, we conclude that the respondent has satisfied the requirements of the collateral consequences exception to *523 the mootness doctrine.[6] This court, therefore, has subject matter jurisdiction over the present appeal.

II
We turn now to the merits of the respondent's appeal. The respondent first argues that the court improperly denied her motion to dismiss for lack of subject matter jurisdiction. Specifically, the respondent argues that the risk warrant failed to allege the facts mandated by § 29-38c (a) for the issuance of the warrant. Although the respondent argues that the court lacked subject matter jurisdiction, she is, in fact, challenging the validity of the underlying risk warrant, and we will consider this claim as such. See State v. Winter, 117 Conn.App. 493, 500, 979 A.2d 608 (2009) (challenge to validity of protective order analyzed as challenge to factual findings of court), cert. denied, 295 Conn. 922, 991 A.2d 569 (2010). We conclude that the court had subject matter jurisdiction over the action and, further, that the risk warrant was issued and executed properly.
"A motion to dismiss ... properly attacks the jurisdiction of the court, essentially asserting that the [state] cannot as a matter of law and fact state a cause of action that should be heard by the court.... A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction.... [O]ur review of the trial court's ultimate legal conclusion and resulting [decision to deny] ... the motion to dismiss will be de novo." (Citations omitted; internal quotation marks omitted.) State v. Courchesne, 296 Conn. 622, 668, 998 A.2d 1 (2010).
Section 29-38c (a) provides: "Upon complaint on oath by any state's attorney or assistant state's attorney or by any two police officers, to any judge of the Superior Court, that such state's attorney or police officers have probable cause to believe that (1) a person poses a risk of imminent personal injury to himself or herself or to other individuals, (2) such person possesses one or more firearms, and (3) such firearm or firearms are within or upon any place, thing or person, such judge may issue a warrant commanding a proper officer to enter into or upon such place or thing, search the same or the person and take into such officer's custody any and all firearms. Such state's attorney or police officers shall not make such complaint unless such state's attorney or police officers have conducted an independent investigation and have determined that such probable cause exists and that there is no reasonable alternative available to prevent such person from causing imminent personal injury to himself or herself or to others with such firearm."
Section 29-38c (b) provides in relevant part: "In determining whether grounds for the application exist or whether there is probable cause to believe they exist, the judge shall consider: (1) Recent threats or acts of violence by such person directed toward other persons; (2) recent threats or acts of violence by such person directed toward himself or herself; and (3) recent acts of cruelty to animals as provided in subsection (b) of section 53-247 by such person. In evaluating whether such recent threats or acts of violence constitute probable cause to believe that such person poses a risk of imminent personal injury to himself or herself or to others, the judge may consider other factors including, but *524 not limited to (A) the reckless use, display or brandishing of a firearm by such person, (B) a history of the use, attempted use or threatened use of physical force by such person against other persons, (C) prior involuntary confinement of such person in a hospital for persons with psychiatric disabilities, and (D) the illegal use of controlled substances or abuse of alcohol by such person...."
The respondent first argues that the risk warrant failed to allege that the affiants had probable cause to believe that she possessed any firearms on May 8, 2008. In support of this argument, the respondent refers to the fact that at the time the firearms were seized, they were located in the evidence room at the Litchfield barracks. She further argues that the court improperly found that a possessory interest or ownership in firearms is sufficient to constitute possession under § 29-38c. The state counters that this overly narrow interpretation of the word "`possesses'" eviscerates the meaning and purpose of the risk warrant statute. We agree with the state.
"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.... [W]e are mindful of the legislature's directive that, [i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly. General Statutes § 1-1 (a).... Words with a fixed legal or judicially settled meaning must be presumed to have been used in that sense.... In ascertaining legislative intent [r]ather than using terms in their everyday sense, [t]he law uses familiar legal expressions in their familiar legal sense." (Citations omitted; internal quotation marks omitted.) State v. Sunrise Herbal Remedies, Inc., 296 Conn. 556, 567-68, 2 A.3d 843 (2010).
The statutory definition of "`possess'" is set forth in General Statutes § 53a-3 (2): "`Possess' means to have physical possession or otherwise to exercise dominion or control over tangible property...." The court found that the respondent "possessed" the firearms in the present case even though they were in the evidence room in the Litchfield barracks. In so finding, the court noted that the respondent had a possessory interest in the weapons because she owned them, and, in the absence of the warrant, could have gone to the Litchfield barracks to reclaim the weapons upon her release from the hospital. This conclusion is supported by the testimony of Thomas Karanda, a detective with the state police special licensing firearms unit, who testified that without the warrant, there would have been no legal authority to hold the weapons.[7] We *525 agree that the respondent was in possession of the firearms even though she did not have physical possession of the firearms at the time the warrant was executed. As noted by the state, without the warrant, once the respondent was released from the hospital, there would have been no legal impediment to her reclaiming the firearms. The respondent, therefore, exercised dominion and control over the firearms sufficient to satisfy the requirements of § 29-38c.
The respondent next argues that the warrant did not allege that she posed an imminent risk of danger to herself or to other individuals, nor did it allege that there was no reasonable alternative available to prevent her from imminently causing personal injury to herself or to others with the firearms. In support of this argument, the respondent argues that, according to the legislative history of § 29-38c, the risk warrant statute is to be used only in the most extraordinary circumstances, which were not present in her case. We conclude that the court properly found that probable cause for the seizure of the weapons had been established.
According to the respondent, at the time the risk warrant was signed, she presented no imminent risk of danger to herself or to other individuals. This is so, she contends, because of the lapse in time between her admission to the hospital on May 1, 2008, and the signing of the warrant on May 8, 2008.[8] The transcript of the hearing before the court reveals that the question of imminence was a concern to the court; the court, however, found that the warrant application satisfied the requirements of the statute in that regard.[9] We agree with this conclusion.
*526 The risk warrant included the attached affidavit of Grigerik and Trooper Laura Kraus. This affidavit recites the underlying and essentially undisputed facts concerning the incident at Troop L on May 1, 2008, which resulted in the respondent's emergency commitment. Specifically, the warrant described the respondent's erratic behavior at the police barracks, her attempt to kill herself the prior week and her view that if the police were not going to pursue her complaint, she had no reason to live. According to the affidavit, before she was transported to the hospital, Covello asked the respondent if she had any weapons with her and, in response, the respondent indicated that she did not need a gun to kill herself, as she had enough medication in her truck to kill herself.
On the basis of the facts recited in the affidavit, which were supported by the testimony at the hearing, the court properly found that there was probable cause to believe that the respondent was an imminent risk of danger to herself or to others and that there were no reasonable alternatives available. The court, therefore, properly declined to dismiss this action for lack of subject matter jurisdiction.

III
The respondent next claims that the court improperly placed the burden on her to prove that she was not at imminent risk of personal injury to herself or to other individuals. We disagree.
Prior to examining the claim, we set forth the applicable standard of review. "When a party contests the burden of proof applied by the court, the standard of review is de novo because the matter is a question of law." (Internal quotation marks omitted.) State v. Petaway, 107 Conn.App. 730, 744, 946 A.2d 906, cert. denied, 289 Conn. 926, 958 A.2d 162 (2008).
Section 29-38c (d)[10] provides that the court shall hold a hearing not later than fourteen days after the execution of the warrant "to determine whether the seized firearms should be returned to the person named in the warrant or should continue to be held by the state...."[11] Pursuant to § 29-38c (d), the state shall have the burden of proving all material facts by clear and convincing evidence. The statute *527 specifically states that "[i]f after such hearing, the court finds by clear and convincing evidence that the person poses a risk of imminent personal injury to himself or herself or to other individuals," it may order that the firearms continue to be held by the state for a period not to exceed one year. General Statutes § 29-38c (d).
The respondent refers to the following statements from the court's decision in support of her claim that the court improperly applied the burden of proof: "So, now we're faced with okay, well, where's the imminent harm? The thing that bothers the court more than anything else was when [the respondent] testified to, and I think counsel even pointed out, well, we don't have any medical evidence. Well, that's part of my problem here today. You don't have any medical evidence, and counsel brought up, well, what do you need to be able to get these guns back? I am very troubled with the fact that since she left the hospital on May [7, 2008], she hasn't sought out any psychiatric help from a doctor, or even her own [general practitioner], and based upon that, I think she's still an imminent risk to harm herself because until we have some evidence to show that she's been getting proper treatment, that she's still at risk to harm herself."
We disagree that, by this statement, the court impermissibly shifted the burden to the respondent to show that she was not an imminent risk. Although the court was concerned that the respondent had not sought treatment upon her discharge from the hospital, this was not the sole basis for its decision. Prior to the challenged statements, the court reviewed the testimony regarding the incident at the police barracks on May 1, 2008, as well as the incident the prior week when the respondent attempted to kill herself. The court also expressed concern over testimony of the respondent that she tried to starve herself while hospitalized.[12] Finally, we note that immediately after the challenged statements, the court specifically indicated that it found that the state had sustained its burden by clear and convincing evidence.[13] We, therefore, conclude that the court did not impermissibly shift the burden of proof to the respondent to show that she did not pose a risk of imminent harm to herself or to others.
The judgment is affirmed.
In this opinion the other judges concurred.
NOTES
[1] Covello testified that he is a licensed paramedic and has had experience with psychiatric patients.
[2] The weapons were listed as follows:

"# 1. Beretta 9mm, Model .84f. ...
"# 2. Beretta 9mm, Model 92EL. ...
"# 3. Smith & Wesson 44 Cal, Model 29-2. ...
"# 4. Beretta 22Cal, Model 21a. ..."
[3] On August 31, 2009, the state filed a motion to dismiss this appeal on the ground of mootness. Specifically, the state noted that the trial court's order had expired on July 23, 2009, and that the state police had returned the respondent's firearms to her on August 5, 2009. The state also indicated that the respondent's pistol permit had been reissued. The state argued, therefore, that there was no practical relief that this court could afford to the respondent, and that her appeal was moot. On November 19, 2009, this court denied the state's motion to dismiss without prejudice, subject to the state's briefing the mootness issue in its brief and the respondent briefing that issue in her reply brief.
[4] In light of this conclusion, we need not address whether the capable of repetition yet evading review exception to the mootness doctrine also applies. See In re Allison G., 276 Conn. 146, 167, 883 A.2d 1226 (2005).
[5] General Statutes § 29-28(b) provides in relevant part: "Upon the application of any person having a bona fide residence or place of business within the jurisdiction of any such authority, such chief of police, warden or selectman may issue a temporary state permit to such person to carry a pistol or revolver within the state, provided such authority shall find that such applicant intends to make no use of any pistol or revolver which such applicant may be permitted to carry under such permit other than a lawful use and that such person is a suitable person to receive such permit. No state or temporary state permit to carry a pistol or revolver shall be issued under this subsection if the applicant (1) has failed to successfully complete a course approved by the Commissioner of Public Safety in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association, (2) has been convicted of a felony or of a violation of subsection (c) of section 21a-279, section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d, (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120, (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13, (5) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding twelve months by order of a probate court, (6) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, (7) is subject to a firearms seizure order issued pursuant to subsection (d) of section 29-38c after notice and hearing, (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 U.S.C. 922(g)(4), (9) is an alien illegally or unlawfully in the United States, or (10) is less than twenty-one years of age...."
[6] In light of this conclusion, we do not address the respondent's argument that collateral consequences also exist by virtue of the notification to the department of mental health and addiction services of the court's order.
[7] The following colloquy occurred at trial between the court and Detective Karanda:

"The Court: So, soin your looking at the investigation, the officers took the weapons as an alternative to running to a judge and getting a judge to sign the warrant that afternoon, correct?
"[The Witness]: Correct.
"The Court: All right. But the point then comes, what are they supposed to do with the weapons? At some point, they don't belong to the police....
"[The Witness]: That's
"The Court: That's, that's why we're here today.
"[The Witness]: That's correct, and if, if [the respondent] had shown up at Troop L the very next day and said, `Give me my guns back,' there would have been no legal authority for them to hold onto the guns at that particular point. That's why we go to the court and ask for [its] approval on the matter."
[8] The respondent was released from the hospital after a Probate Court hearing at the hospital on May 7, 2008.
[9] The legislative history behind § 29-38c indicates that the question of imminence was of concern to the legislators as well. Specifically, during the debate on the floor of the House of Representatives, Representative Ronald S. San Angelo indicated that "the standard is set extremely high. Imminent danger to himself or to others which means that he has to be getting ready to either kill himself or to kill somebody else.... It's a temporary process to get the guns out of the hands of somebody that is in imminent danger to himself or to others.

"And we've set some of the things that the judge has to look at. Again, they're very high. You have to have firearms in your house. You have to be brandishing them. You cannot be cruel to animals....
"I believe that any reasonable judge in the State of Connecticut will be extremely cautious in putting this provision forward, will look at it very closely for absolute purposes of legislative intent, it makes it absolutely clear that this is not intended to be used very often, but only in very rare extreme situations." 42 H.R. Proc., Pt. 15, 1999 Sess., pp. 5354-55.
The question of imminence also came up during the proceedings on the floor of the Senate, as indicated by the following colloquy:
"[Senator Winthrop S. Smith, Jr.]: I mean, somebody's going to put an affidavit or something in front of a judge. And imminent, I mean if you're imminent, a car crash is imminent, that's seconds. Hours are imminent. Here, days, hours, imminent here is what?
"The Chair: Senator [George C.] Jepsen.
"[Senator] Jepsen: Again, I think that a judge would be evaluating on the basis of the evidence placed in front of him. I agree, imminent in the context of a car crash is seconds. This clearly means less than two weeks, because the time of the hearing.
"And I would think hours appears to be too short. But, so I think it would be a time period measured in a couple of days. But that would be the opinion of the judge attaching meaning, as judges always do, to standards that we, that we set....
"So, if I were offering my opinion, I think imminent in this context would mean anywhere from hours to a few days in time. But that would be the job of the judge. And as in so many areas, we allow common law and judicial frames of reference to flesh out standards such as this. But I think it's a pretty clear standard." 42 S. Proc., Pt. 9, 1999 Sess., pp. 3130-31.
[10] General Statutes § 29-38c (d) provides: "Not later than fourteen days after the execution of a warrant under this section, the court for the geographical area where the person named in the warrant resides shall hold a hearing to determine whether the seized firearms should be returned to the person named in the warrant or should continue to be held by the state. At such hearing the state shall have the burden of proving all material facts by clear and convincing evidence. If, after such hearing, the court finds by clear and convincing evidence that the person poses a risk of imminent personal injury to himself or herself or to other individuals, it may order that the firearm or firearms seized pursuant to the warrant issued under subsection (a) of this section continue to be held by the state for a period not to exceed one year, otherwise the court shall order the seized firearm or firearms to be returned to the person named in the warrant. If the court finds that the person poses a risk of imminent personal injury to himself or herself or to other individuals, it shall give notice to the Department of Mental Health and Addiction Services which may take such action pursuant to chapter 319i as it deems appropriate."
[11] The risk warrant was executed on May 14, 2008. The hearing in this matter commenced on May 27, and concluded on July 24, 2008.
[12] Immediately prior to the challenged statements, the court stated: "Certainly, her actions over the next several days when ... she said she was trying to starve herself even after being told by hospital personnel that she was going to harm herself, and that didn't stop."
[13] The court stated: "So, based upon that, I'm going to find based on clear and convincing evidence that the state has sustained [its] burden, and I am going to order and find that she still poses an imminent risk of personal injury ... to herself, and I'm going to order the firearms continue to be held for a period of up to one year, and that one year date will be July 23, 2009."